IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MID-CENTURY INSURANCE COMPANY, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 21-5592 |
| | : | |
| v. | : | |
| | : | |
| CHAD WERLEY and JANE WERLEY, | : | |
| individually and as parents and natural | : | |
| guardians of Levi Werley, a minor, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

Smith, J.                                                                                     March 30, 2023

From the founding of the Colony of Pennsylvania by William Penn in 1681, and its inclusion as one of the original 13 colonies that formed the United States of America, Pennsylvania has a rich and storied history. Pennsylvania is the state where the Declaration of Independence was signed and was a major producer of steel and coal that helped spur the Industrial Revolution. More recently, Pennsylvania is known as the state which holds the Little League World Series and is the birthplace of Taylor Swift. In the automobile insurance industry, Pennsylvania is well known for a less entertaining but still engaging reason: Its extensive litigation around the concept of "stacking" uninsured or underinsured motorist coverage ("UM" and "UIM", respectively) and the application of "family car" or "household vehicle" exclusions in automobile insurance policies, especially as to their effect on waivers of stacked UM/UIM coverage.

"Family car" or "household vehicle" exclusions generally exclude from coverage accidents where a family member of an insured suffers bodily injury while occupying or operating an uninsured motor vehicle. For instance, if an adult daughter is residing with her mother at a time when the daughter is injured by an underinsured motorist while she was operating a truck that was

not listed as a covered vehicle under her mother's auto policy, the daughter would likely be precluded from seeking UIM coverage under that policy if it contained a household vehicle exclusion.

Regarding stacking, this term generally relates to an insured combining coverage limits for multiple vehicles insured under a single auto insurance policy. For example, if an insured insures two vehicles on the same policy that contains UM/UIM bodily injury limits of $50,000 on each vehicle, stacking the coverage would increase the insured's UM/UIM bodily injury limits to $100,000. This type of stacking is generally known as "intra-policy" stacking. There is also a second type of stacking, where the coverage is stacked across two or more separate auto policies insuring a single individual. This is recognized as "inter-policy" stacking.

In Pennsylvania, issues relating to these two methods of stacking UM/UIM coverage are governed by Pennsylvania's Motor Vehicle Financial Responsibility Law, 75 Pa. C.S. §§ 1701–99.7 ("MVFRL"), which the Pennsylvania General Assembly passed in part to protect individuals from uninsured and underinsured motorists who could not adequately compensate those individuals for injuries caused by those motorists. The MVFRL specifically provides for intra- and inter-policy stacking. In fact, under the MVFRL, the default UM/UIM coverage is intra- and inter-policy stacked coverage unless the insured expressly waives stacked coverage through a legislatively crafted waiver.

Unfortunately, despite the MVFRL providing for default intra- and inter-policy stacking, the language of the MVFRL's stacking waiver clearly only applies to intra-policy stacking. Although the Pennsylvania Supreme Court highlighted this issue for Pennsylvania's General Assembly as early as 2006, it has not lit a fire under the General Assembly to amend the MVFRL's stacking provisions. Without any changes by the General Assembly, extensive litigation has

occurred in Pennsylvania state and federal courts, who have been called upon to try to resolve issues relating to interpreting the MVFRL's stacking provisions, particularly regarding the interplay between stacking, stacking waivers, and household vehicle exclusions.

In this case, the court has been requested to resolve a UIM coverage dispute between an insurer and its insureds, two parents and their then-minor son, where the son was injured in an accident caused by an underinsured motorist while the son was operating the family's dirt bike off-road. At the time of the accident, the son was insured under his parents' two automobile insurance policies they had purchased from the plaintiff insurer. One of those policies was a single-vehicle policy and the other a multi-vehicle policy, and the parents expressly waived intra-policy stacking for both policies. As for the dirt bike, it was not insured under any policy. However, the insurer does not dispute that the dirt bike did not have to be insured under the MVFRL (insofar as it was only operated off-road), and it is not currently contesting the parents' assertion that they did not believe they had to insure the dirt bike or know whether they could insure the dirt bike.

The insureds first sought and obtained payment of the policy limits from the underinsured motorist's policy. They then submitted UIM claims under both of their policies with the plaintiff insurer. The insurer paid the UIM limits under the single-vehicle policy but refused to pay on the multi-vehicle policy because it contained a "household vehicle exclusion," which excluded UIM coverage for any "bodily injury sustained by you or any family member while occupying . . . any motor vehicle owned by you or any family member which is not insured for this coverage under any similar form." Essentially, since the dirt bike was uninsured, the insurer determined that this exclusion precluded UIM coverage for the son's injuries in the accident. The insurer's refusal to pay on the multi-vehicle policy led the parties to file competing declaratory judgment actions in

this court, where they seek to have the court determine whether the insurer must pay UIM benefits under the multi-vehicle policy.

The parties have now filed cross-motions for summary judgment and, as they are not contending that there are any genuine issues of material fact, this court can resolve the dispute over the insurer's obligations under the multi-vehicle policy. To resolve this dispute, the court must address two issues: The first issue is whether the parents' policies can be stacked. If they can, the second issue is whether the household vehicle exclusion precludes stacking. The court will briefly discuss both issues, but in reverse order.

Regarding this second issue, the Pennsylvania Supreme Court, as recently as 2021, has made it abundantly clear that if an insured has not knowingly waived *inter-policy* stacked UM/UIM coverage, a household vehicle exclusion is unenforceable if it operates as a *de facto* waiver of this form of stacked UM/UIM coverage. Therefore, if the son can stack coverage, even though the household vehicle exclusion in this case is unambiguous and would exclude coverage of the accident, this court could not enforce it to prevent inter-policy stacked coverage.

As for the first issue, it appears to be an issue of first impression by a state or federal court in this Commonwealth: If an uninsured or underinsured motorist injures a person while the person is occupying or operating a vehicle which is not required to be insured and, in fact, is uninsured, and the insurer pays UM/UIM benefits under a policy covering a vehicle not involved in the accident to which the injured person is insured (also known as a "second-priority policy"), may the injured person stack UM/UIM coverage on another second-priority policy? Stated differently, does inter-policy stacking under the MVFRL depend on the vehicle involved in the accident having UM/UIM coverage when the person seeking stacked coverage receives UM/UIM benefits from a second-priority policy and is insured under another second-priority policy?

4

As discussed below, no matter which way the question is framed, the answer is the same: The MVFRL does not delineate that stacking may only occur if there is UM/UIM coverage on a host vehicle. Rather, inter-policy stacking is dependent on there being a policy covering a vehicle under which the claimant is an insured *first* providing UM/UIM coverage for an accident. The lack of UM/UIM coverage on the host vehicle is only relevant (and, admittedly, it is relevant almost all the time) when the individual seeking UM/UIM benefits from a second-priority policy is seeking benefits from that second-priority policy in the first instance, and the second-priority policy contains an enforceable exclusion that would deny coverage in the first instance. In these circumstances, courts unequivocally decline to stack UM/UIM coverage because there is no first policy providing UM/UIM benefits upon which to stack the second-priority policy.

This case, however, does not involve claimants seeking UM/UIM benefits where the owner of the dirt bike voluntarily elected to waive UM/UIM benefits on the dirt bike. Instead, the insurer is not disputing that the MVFRL did not require the parents to insure the dirt bike and that the parents did not believe it had to be insured because it was used only off-road. Regardless, the coverage issue here is not dependent on the lack of UM/UIM coverage on the dirt bike because the son received UM/UIM benefits from a second-priority policy. As such, he is not seeking UM/UIM coverage on his parents' other second-priority policy in the first instance. Instead, he is seeking to stack the UIM limits on another second-priority policy in which he is an insured. In this unique circumstance, the MVFRL permits inter-policy stacking absent a valid inter-policy stacking waiver. The parents here did not execute a knowing waiver of inter-policy stacking on their multi-vehicle policy because the intra-policy stacking waiver the parents executed in this case is insufficient as a matter of law to also waive inter-policy stacking in a multi-vehicle policy. Therefore, since the insurer paid UIM benefits to the son under the single-vehicle second-priority

policy, and the son was also insured for UIM coverage under the multi-vehicle, second-priority policy, the son is entitled to stack the UIM coverage limits available to the son under the second policy because the parents did not knowingly waive inter-policy stacking. In other words, in this very rare situation, the ability to stack follows the son and not the dirt bike.

Accordingly, the insureds are entitled to stack UIM limits under the two policies to cover the son's injuries in the accident. The court will grant the parents' motion for summary judgment, deny the insurer's cross-motion for summary judgment, and enter a declaration that the insurer has the duty to provide UIM coverage under the second policy.

## I.    PROCEDURAL HISTORY

The plaintiff, Mid-Century Insurance Company ("Mid-Century"), commenced this action by filing a complaint against the defendants, Chad Werley and Jane Werley, individually and as parents and natural guardians of Levi Werley, a minor (together, "the Werleys"), on December 23, 2021. *See* Doc. No. 1. The complaint asserts a single claim under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, seeking a declaration that Mid-Century has no duty to provide underinsured motorist ("UIM") coverage to the Werleys under an auto insurance policy issued by Mid-Century to the Werleys. *See* Compl. at ¶¶ 8, 10, 11, 29, 30, Doc. No. 1.

In response to the complaint, the Werleys filed a motion to dismiss for failure to state a claim on February 28, 2022. *See* Doc. No. 8. The court denied the motion without prejudice via an order entered on March 3, 2022. *See* Doc. No. 10. On March 16, 2022, the Werleys filed an answer with affirmative defenses to the complaint and a counterclaim against Mid-Century. *See* Doc. No. 13. In the counterclaim, the Werleys seek their own declaratory judgment that UIM coverage is available to them under the same Mid-Century policy. *See* Defs.' Answer and Countercl. at ¶¶ 31–

37, 49–50, Doc. No. 13. Mid-Century filed an answer to the Werleys' counterclaim on April 6, 2022. *See* Doc. No. 15.

On August 12, 2022, the Werleys filed a motion for summary judgment, a statement of undisputed material facts, and a supporting brief. *See* Doc. No. 20. On September 15, 2022, Mid-Century filed a response in opposition to the Werleys' motion for summary judgment and a cross-motion for summary judgment. *See* Doc. No. 21. That same day, Mid-Century filed a response to the Werleys' statement of undisputed material facts. *See* Doc. No. 22. The Werleys filed a response in opposition to Mid-Century's motion for summary judgment on September 21, 2022. *See* Doc. No. 23. The court heard oral argument on the cross-motions for summary judgment on October 4, 2022. *See* Doc. No. 17. The cross-motions are now ripe for review.

## II.     BRIEF EXPLANATION OF UM AND UIM COVERAGE

Before setting forth the factual record the court is considering for purposes of the cross-motions for summary judgment, a brief discussion of UM and UIM coverage, including stacking said coverage, will provide context for the court's recitation of that record and analysis of the issues presented by the cross-motions in this case.

Auto policies often include UM or UIM coverage. UM benefits cover insureds injured in accidents with an uninsured tortfeasor. *See* 9 Steven Plitt, et al., *Couch on Insurance* § 122:2 (3d ed. Nov. 2022 update) ("*Couch*") (explaining that UM is intended to "compensate victims of vehicular accidents caused by persons who do not carry liability insurance or have inadequate amounts of liability insurance").[1] Similarly, UIM benefits protect insureds involved in accidents with a tortfeasor insufficiently insured to cover all damage caused by the tortfeasor. *See id.* § 122:3

---

[1] "Uninsured motorist coverage is not liability insurance in any sense but resembles limited accident insurance or an indemnity contract. This is not an additional liability coverage but, rather, is direct compensation to the insured who is injured by an uninsured motorist who is at fault." *Couch* § 122:2 (footnotes omitted).

("The concept of [UIM coverage] is that the insured purchases a set limit of UIM, guaranteeing recovery for injuries up to that amount; if the persons responsible for the victim's injuries are insured but for amounts lower than the victim's UIM limits. The victim is able to collect the difference under the UIM policy."). Overall, UM/UIM coverage "serves to promote the recovery of damages for innocent victims of accidents with uninsured or underinsured drivers." *Lewis v. Erie Ins. Exch.*, 793 A.2d 143, 151 (Pa. 2002).

If an insured has more than one policy with UM/UIM coverage or more than one automobile covered under a single policy with UM/UIM coverage, the insureds' UM/UIM benefits may stack. The term stack or "'[s]tacking' refers to the practice of combining the insurance coverage of individual vehicles to increase the amount of total coverage available to an insured." *Gallagher v. GEICO Indem. Co.*, 201 A.3d 131, 132 n.1 (Pa. 2019). There are two types of stacking: intra-policy and inter-policy. "Intra-policy stacking is the aggregation of the coverage limits on multiple vehicles covered under a single policy—even though not all vehicles are involved in the accident or occurrence." *Donovan v. State Farm Mut. Auto Ins. Co.*, No. 19-2733, 2022 WL 473025, at *1 (3d Cir. Feb. 16, 2022). Also, while

> [i]ntrapolicy stacking by definition involves the same insurer and the same primary, named insured, but the status of the person seeking to stack benefits may vary from the primary named insured to a pedestrian who is struck by the vehicle and seeks no-fault benefits under that vehicle's policy as well as under another policy that happens to be applicable.

*Couch* § 169:7.

"In contrast, inter-policy stacking is the aggregation of coverage limits for vehicles insured under separate policies." *Donovan*, 2022 WL 473025, at *1. Inter-policy stacking permits an individual insured under multiple auto policies with UM and UIM coverage to combine the limits of each policy under which they are insured. *See Couch* § 169:7 (describing inter-policy stacking

as when "a single insured . . . fall[s] within the protection of several different policies, and [it is] potentially possible for the same insured and same incident to arguably fall within both an automobile liability insurance policy and a general liability insurance policy").[2]

Regarding UM/UIM policy limits, those limits are often expressed as a number, followed by a slash, then a second number, *e.g.*, $100,000/$200,000. *See id.* § 171:14 ("Similar to liability coverage, UM/UIM coverage generally defines two limits of liability."). The number preceding the slash provides the coverage limit per injured person, which "caps the carrier's liability to any one claimant." *Id.* The number following the slash provides the total coverage per accident, which "caps the carrier's liability to the set of claimants injured in one accident." *Id.* Under a policy with UM/UIM limits of $100,000/$200,000, if one person was injured in a covered accident, they would be insured up to a $100,000 UM/UIM limit. If multiple people were injured, the insurer would insure up to $200,000 for the accident.

## III.    FACTUAL RECORD

In late-June 2019, then-15-year-old Levi Werley ("Levi"),[3] who was residing with his parents, Chad and Jane Werley, attended a "Jeep Party," a neighborhood gathering where people bring vehicles—often Jeeps—to ride off-road trails together. *See* Defs.' SOF at ¶ 1; Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts in Supp. of Mot. for Summ. J. ("Pl.'s Resp.") at

---

[2] Some forms of inter-policy stacking may include:

   • Multiple policies from the same insurer or from different insurers.
   • Policies may have been issued to the same named insured or to different named insureds.
   • The party seeking to stack coverages may be the named insured, a specified additional insured, such as a "relative," who is expected to be a frequent user of the vehicle, a "chance" additional insured, such as a permittee operator or a guest passenger, or a "stranger" to the vehicle, such as the pedestrian seeking no-fault benefits after having been struck by it.

*Couch* § 169:7.

[3] According to the Werleys, Levi turned 18 on February 26, 2022. *See* Defs.' Statement of Undisputed Material Facts in Supp. of Defs.' Mot. for Summ. J. ("Defs.' SOF") at 1 n.1, Doc. No. 20-2.

¶ 1, Doc. No. 22. Levi brought his family's Yamaha YZ85 dirt bike (the "Dirt Bike") to the Jeep

Party.[4] Defs.' SOF at ¶ 1; Pl.'s Resp. at ¶ 1. While Levi was operating the Dirt Bike, the Jeep Party

took a tragic turn when he was struck by a Jeep CJ-7 being operated by another 15-year-old. *See*

Defs.' SOF at ¶ 6; Pl.'s Resp. at ¶ 6. Levi appears to have suffered severe injuries in the accident.[5]

---

[4] The Werleys did not register or insure the Dirt Bike. *See* Defs.' SOF at ¶ 10; Pl.'s Resp. at ¶ 10. They did not do so because they aver that it was never operated on public roads (and was not operated as such in this case); therefore, the MVFRL did not require them to insure it. *See* Defs.' SOF at ¶ 10 ("Under Pennsylvania law, the Dirt Bike was not required to be registered or insured because it was never operated on public roads." (citations omitted)). Mid-Century's statements relating to whether the Dirt Bike had to be registered or insured are somewhat confusing. For instance, in its response to the Werleys' requests for admissions, Mid-Century stated:

> **Request for Admission No. 6**
>
> Under Pennsylvania law, the Dirt Bike was not required to be registered or insured because it was never operated on public roads.
>
> **Response:** Admitted with explanation. Implicit in this Request for Admission is the concession that the Dirt Bike qualified as a "motor vehicle" under 75 Pa. C.S.A. § 102 of the Pennsylvania Motor Vehicle Code so as to require registration and insurance prior to its operation on a public roadway. However, even if the Dirt Bike had been registered and insured, Levi Werley was an unlicensed 15-year-old at the time of the accident who could not have lawfully driven it on any Pennsylvania roadway, yet was permitted by his parents to drive the Dirt Bike on private property at "Jeep Parties" put on by neighbors and friends.

Defs.' SOF, Ex. A, Pl.'s Resps. to First Set of Requests for Admission of Defs. ("Pl.'s Resp. to RFAs") at ECF p. 3, Doc. No. 20-3. Then, Mid-Century responded to the Statement No. 10 of the Werleys' statement of undisputed material facts in support of their motion for summary judgment, in which the Werleys repeated their request for admission No. 6 verbatim, *see id.* at ¶ 10, with the following:

> Admitted. By way of further response, the Dirt Bike constituted a "motor vehicle" under 75 Pa. C.S.A. § 102 of the Pennsylvania Motor Vehicle Code so as to require registration and insurance prior to its operation on a public roadway. *See Burdick v. Erie Ins. Group*, 946 A.2d 1106, 1109 (Pa. Super. 2008); *Sona v. State Farm Mut. Auto. Ins. Co.*, 805 F. Supp. 2d 72, 76 (M.D. Pa. 2011). However, even if the Dirt Bike had been registered and insured, Levi Werley was an unlicensed 15-year-old at the time of the accident who could not have lawfully driven it on any Pennsylvania roadway, but was permitted by his parents to drive the Dirt Bike on private property at "Jeep Parties" routinely put on by neighbors and friends.

Pl.'s Resp. at ¶ 10. The court has interpreted these responses as showing that Mid-Century admits that the Werleys were not required to register or insure the Dirt Bike. *Cf. Com., Dep't of Transp., Bureau of Driver Licensing v. Lear*, 616 A.2d 185, 187–88 (Pa. Commw. 1992) ("[E]ven though Lear's dirt bike may not have been a 'vehicle' or 'motor vehicle' [under the Vehicle Code] while it was operated off-the-road, once it was operated upon the highway it became a vehicle subject to the registration requirements of Section 1301 and consequently a motor vehicle subject to the financial responsibility requirements of Section 1786."). It is also unclear why Mid-Century's "further response," or "explanation," is relevant to the court's resolution of the cross-motions for summary judgment.

[5] At the time of the accident both Levi and the other motorist were 15 years old and unlicensed. *See* Defs.' SOF at ¶ 6; Pl.'s Resp. at ¶ 4. Pennsylvania requires individuals to be at least 16 years of age to get a junior driver's license. *See* 75 Pa. C.S. § 1503(c) ("The department may issue a junior driver's license to a person 16 or 17 years of age under rules and regulations adopted by the department and subject to the provisions of this section. A junior driver's license

*See* Pl.'s Resp., Ex. C, Jane Werley Feb. 28, 2020 Dep. at 25:20–26:16, Doc. No. 22 (describing Levi's injuries sustained in accident).[6] The other motorist had insurance which covered the accident, and their insurer paid their policy's bodily injury limit, which was $100,000. *See* Defs.' SOF at ¶ 7; Pl.'s Resp. at ¶ 7. Believing this amount to be insufficient to cover Levi's damages, the Werleys then sought UIM coverage from two auto insurance policies they had purchased from Mid-Century. *See* Defs.' SOF at ¶ 24; Pl.'s Resp. at ¶ 24.

The Werleys' first policy, policy number 19180-15-76 (the "Subject Policy"), identified Chad and Jane Werley as the named insureds and insured four vehicles. *See* Defs.' SOF at ¶¶ 11, 13, 15; Pl.'s Resp. at ¶¶ 11, 13, 15. The Dirt Bike was not a named or listed vehicle under the Subject Policy. Defs.' SOF at ¶ 15; Pl.'s Resp. at ¶ 15. The Subject Policy provided UIM coverage for bodily injury limits of $250,000/$500,000, and the Werleys expressly rejected intra-policy stacking. Defs.' SOF at ¶ 13; Pl.'s Resp. at ¶ 13. The Subject Policy also had a household vehicle exclusion which stated in relevant part that UIM coverage would not apply "[t]o **bodily injury** sustained by you or any **family member** while occupying or when struck by any motor vehicle owned by you or any **family member** which is not insured for this coverage under any similar form."[7] Compl., Ex. A, Subject Policy at ECF p. 25.[8]

---

shall automatically become a regular driver's license when the junior driver attains 18 years of age."). Because the motor vehicles were being operated on private property, the operators were not required to have driver's licenses. *See* Pl.'s Resp. at ¶¶ 4, 10; *see also* 75 Pa. C.S. § 1501(a) ("No person, except those expressly exempted, shall drive any motor vehicle upon a highway or public property in this Commonwealth unless the person has a driver's license valid under the provisions of this chapter."); *id.* (defining "public property" as "includ[ing], but . . . not limited to, driveways and parking lots owned or leased by the Commonwealth, a political subdivision or an agency or instrumentality of either"); *id.* § 102 (defining "highway" as "[t]he entire width between the boundary lines of every way publicly maintained when any part thereof is open to the use of the public for purposes of vehicular travel. The term includes a roadway open to the use of the public for vehicular travel on grounds of a college or university or public or private school or public or historical park").

[6] Mrs. Werley's deposition transcript begins on ECF p. 52 of Doc. No. 22.

[7] The Subject Policy does not define the term "motor vehicle." Pennsylvania's Vehicle Code defines a "motor vehicle" as "[a] vehicle which is self-propelled except an electric personal assistive mobility device or a vehicle which is propelled solely by human power." 75 Pa. C.S. § 102.

[8] Hereinafter, the court will cite to the Subject Policy without identifying it as an attachment to the complaint.

The Werleys' second policy, policy number 19612-65-17 (the "Other Policy"), identified Chad and Olivia Werley[9] as the named insureds and covered a single vehicle, a 1999 Jeep Grand Cherokee. *See* Defs.' SOF at ¶¶ 20, 21; Pl.'s Resp. at ¶¶ 20, 21; Pl.'s Resp. to RFAs, Ex. A. The Other Policy provided $250,000/$500,000 in UIM coverage, and the Werleys expressly rejected intra-policy stacking. See Defs.' SOF at ¶ 23; Pl.'s Resp. at ¶ 23; Pl.'s Resp. to RFAs No. 17.[10] As with the Subject Policy, the Other Policy had a household vehicle exclusion pertaining to UIM coverage; however, it contained different language from the Subject Policy. *Compare* Subject Policy at ECF p. 25 (describing household vehicle exclusion), *with* Pl.'s Resp. to RFAs, Ex. A, Other Policy at ECF p. 24 (same).[11] In this regard, the Other Policy's household vehicle exclusion excluded UIM coverage for "**bodily injury** sustained by **you** or any **family member** while **occupying** or when struck by any **<u>car</u>** owned by **you** or any **family member** which is not insured for this coverage under this policy under any similar form." Other Policy at ECF p. 24 (add'l emphasis added to "car"). Mid-Century apparently determined that the Dirt Bike did not fall under the definition of a "car" in the household vehicle exclusion, so it paid the $250,000 UIM bodily injury limit under the Other Policy to the Werleys. *See* Defs.' SOF at ¶ 25; Pl.'s Resp. at ¶¶ 23,

---

[9] Olivia Werley is the daughter of Chad and Jane Werley, and she is Levi's older sister. *See* Defs.' SOF at ¶ 20; Pl.'s Resp. at ¶ 20; Pl.'s Resp., Ex. A, Levi Werley Feb. 28, 2020 Dep. at 8:15–8:24 (testifying that Olivia is older than him).

[10] Mid-Century represents that the Werleys also validly waived inter-policy stacking on the Other Policy. *See* Pl.'s Resp. to RFAs No. 17 ("Admitted with qualification. [The Other Policy] was a single-vehicle policy, which had a valid stacking waiver for <u>both</u> intra-policy and inter-policy stacking."); Pl.'s Resp. at ¶ 23 ("The Second Policy was a single-vehicle policy, which had a valid stacking waiver for **both** intra-policy and inter-policy stacking signed by Defendant Chad Werley. *See Donovan v. State Farm Mut. Auto. Ins. Co.*, 256 A.3d 1145, 1153-57 (Pa. 2021) (holding that § 1738 stacking waiver 'does not provide the necessary knowing waiver of inter-policy stacked coverage, **absent the single-vehicle situation in *Craley***'") (emphasis added) (citing *Craley v. State Farm Fire and Cas. Co.*, 895 A.2d 530 (Pa. 2006)). While Mid-Century accurately recites Pennsylvania law relating to the effect of an intra-policy stacking waiver that follows 75 Pa. C.S. § 1738(d) on a multi-vehicle policy, they have not represented that the Werleys signed a waiver which contained language expressly referencing inter-policy stacking.

[11] Hereinafter, the court will cite to the Other Policy without referencing it as an attachment to the Mid-Century's response to the Werleys' requests for admissions.

25.[12] It also denied the Werleys' UIM claim under the Subject Policy based on the household

vehicle exclusion in the policy. *See* Defs.' SOF at ¶ 26; Pl.'s Resp. at ¶ 26.

## IV.    DISCUSSION

### A.    <u>Standard of Review – Motions for Summary Judgment</u>

A district court "shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

---

[12] Although ultimately irrelevant to the issues in this case, it is intriguing that Mid-Century paid UIM benefits under the Other Policy. Concerning UIM benefits, the Other Policy stated Mid-Century would

> pay for damages an **insured person** is legally entitled to recover from the owner or operator of an **underinsured motor vehicle** because of **bodily injury** sustained by an **insured person**, caused by an **accident**, and arising out of the ownership, maintenance or use of an **underinsured motor vehicle**.

*See* Other Policy at ECF p. 22. As illustrated by this language, for Mid-Century to cover Levi's accident, it would have to involve (1) an "insured person," (2) an "underinsured motor vehicle," (3) "bodily injury," and (4) an "accident." The court discusses each part in turn.

Regarding an "insured person," the Other Policy defines an "insured person" in relevant part as "**You**, any **family member** or any other person listed as an additional driver on the **Declarations Page**." *Id.* It also defines a "family member" as "a person who resides with **you** and who is related to **you** by blood, marriage or adoption, including a ward or foster child" and "a minor in the custody of **you** or of a person related to **you** who resides with **you**." *Id.* at ECF p. 18. The Second Policy defines "you" as "the **named insured** shown on the **Declarations Page** and **your** spouse, if a resident of **your** household." *Id.* at ECF p. 17. The "named insured[s]" in the Second Policy are Chad Werley, Olivia Werley, and Jane Werley. Based on these definitions, Levi qualifies as an "insured person" under the Other Policy because he was a "family member" related to his parents, who are named insureds, by blood.

As for an "underinsured motor vehicle," the Other Policy defines an "underinsured motor vehicle" in part as "a land motor vehicle or trailer of any type to which a **bodily injury** liability policy applies at the time of the **accident** but the sum of all applicable limits of liability for **bodily injury** is less than the full amount that an **insured person** is legally entitled to recover as **damages**." *Id.* at ECF p. 22. Under this definition, Levi was injured by an "underinsured motor vehicle." *Id.*

Concerning an "accident," the Other Policy defines an "accident" as "a sudden, unexpected and unintended event[, which] . . . arise[s] out of the ownership, maintenance or use of a **car** and cause[s] **bodily injury** or **property damage**." *Id.* at ECF p. 17. The Other Policy defines "bodily injury" as "accidentally sustained bodily harm to an individual including any resulting illness, disease or death." *Id.* Based on these definitions, Levi appears to have suffered bodily injury in an accident if it arose out the "ownership, maintenance, or use of a car."

The Second Policy defines a "car" as:

> [A] four-wheeled private passenger car of the coupe, sedan, station wagon, pick-up truck, van or sport utility type, with gross vehicle weight of 14,000 pounds or less, and licensed for and ***used-only upon public highways***. It does not include a motorhome, a step van, parcel delivery van, cargo cutaway van, or other van with the cab separate from the cargo area.

Doc. No. 20-3 at ECF p. 17. Considering that Levi was struck by a Jeep which was operating "off road on private property," Defs.' SOF at ¶ 1; Pl.'s Resp. at ¶ 1; Compl. at ¶ 5, it is arguable that the tortfeasor's Jeep is not "used-only upon public highways" and the Dirt Bike was not "used-only upon public highways."

Civ. P. 56(a). Additionally, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 105 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

The party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the moving party has met this burden, the non-moving party must counter with "specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted); *see* Fed. R. Civ. P. 56(c) (stating that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by: . . . citing to particular parts of materials in the record . . .; or . . . [by] showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact"). The non-movant must show more than the "mere existence of a scintilla of evidence" for elements on which the non-movant bears the burden of production. *Anderson*, 477 U.S. at 252. "[B]are assertions, conclusory allegations or suspicions" are insufficient to defeat summary judgment. *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969

14

(3d Cir. 1982); *see Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999) (explaining that "speculation and conclusory allegations" do not satisfy non-moving party's duty to "set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor"), *superseded by statute on other grounds as recognized by P.P. v. W. Chester Area. Sch. Dist.* 585 F.3d 727 (3d Cir. 2009). Additionally, the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000) (citing *Celotex*, 477 U.S. at 324). In other words, "a plaintiff cannot resist a properly supported motion for summary judgment merely by restating the allegations [in the] complaint, but must point to concrete evidence in the record that supports each and every essential element of [their] case." *Orsatti*, 71 F.3d at 484 (citing *Celotex*, 477 U.S. at 322). Moreover, "[l]egal memoranda and oral argument are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007) (citation omitted). The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted). Further, when one party's story is

"blatantly contradicted by the record, so that no reasonable jury could believe it," the court should not "adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The above standards do "not change when the issue is presented in the context of cross-motions for summary judgment." *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987). "When confronted with cross-motions for summary judgment, the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard." *Marciniak v. Prudential Fin. Ins. Co. of Am.*, 184 F. App'x 266, 270 (3d Cir. 2006) (citations omitted).

## B.    Analysis

As the parties are not contending that there are genuine issues of material fact, this court can decide whether the Werleys are entitled to inter-policy stacking on the Subject Policy. In advocating their respective positions on this issue, while there is overlap in their arguments, each side's focus is slightly different. In Mid-Century's motion for summary judgment, it primarily focuses on the Dirt Bike. Mid-Century points out that the Dirt Bike was not a covered vehicle under the Werleys' policies; as such, it argues that there is no UIM coverage upon which they could stack the Subject Policy. *See* Pl. Mid-Century Insurance Co.'s Br. in Opp'n to Mot. for Summ. J. of Defs. ("Pl.'s Br.") at 8, Doc. No. 21-1. Essentially, Mid-Century contends that there must be a "host-vehicle" policy covering the vehicle occupied by the insured in an accident before an insured may seek to inter-policy stack a second-priority auto policy covering the insured. *See id.* at 14–15. Mid-Century also asserts that allowing the Werleys' to stack coverage on the Subject Policy would reward them with stacked coverage despite having never purchased it and never having insured the Dirt Bike. *See id.* at 15–17.

16

In the Werleys' motion for summary judgment, they focus on Levi and the household vehicle exclusion. As to the latter, the Werleys argue that they are entitled to inter-policy stacked benefits on the Subject Policy because they never expressly waived inter-policy stacking of UIM benefits under this policy. *See* Br. of Defs. in Supp. of Mot. for Summ. J. ("Defs.' Br.") at 6–10, Doc. No. 20-1. Therefore, the household vehicle exclusion would operate as a *de facto* waiver of inter-policy stacking, which renders the exclusion invalid under recent precedent from the Pennsylvania Supreme Court. *See id.* They also dispute Mid-Century's argument about there being a lack of a UIM policy upon which to stack because the insurer paid UIM benefits for Levi's injuries via the Other Policy. *See id.* at 10–12.

To resolve these competing arguments, the court must first start with the MVFRL and the development of the caselaw addressing stacking and household vehicle exclusions.

### 1.      The MVFRL

Pennsylvania's General Assembly enacted the MVFRL in 1984.[13] *See Allwein v. Donegal Mut. Ins. Co.*, 671 A.2d 744, 747 (Pa. Super. 1996). Although "[t]he MVFRL contains no explicit

---

[13] Prior to the MVFRL,

> basic motor vehicle insurance was required pursuant to the former No–Fault Motor Vehicle Insurance Act. This represented the first comprehensive motor vehicle insurance enactment, promulgated with the express purpose of establishing a statewide system of basic loss benefits for accident victims at reasonable cost. *See* 40 P.S. § 1009.102(b)(repealed). The No–Fault Act embodied a principle known as "maximum feasible restoration" to accident victims, *see Paylor v. Hartford Ins. Co.*, 536 Pa. 583, 587, 640 A.2d 1234, 1235 (1994), manifested in provisions such as that which required unlimited medical coverage. *See* 40 P.S. §§ 1009.103, 1009.202 (repealed). The previously enacted UM Act codified the requirement of UM coverage in liability insurance policies under the previously existing fault system, *see Tubner v. State Farm Mut. Auto. Ins. Co.*, 496 Pa. 215, 220 n. 11, 436 A.2d 621, 623 n. 11 (1981), and was effectively integrated into the no-fault system. Under the UM Act, a motor vehicle liability policy issued in Pennsylvania and covering any vehicle registered or principally garaged in the Commonwealth was required to include coverage for the protection of persons insured under the policy who become legally entitled to recover damages from the owners or operators of uninsured vehicles, pursuant to provisions approved by the Insurance Commissioner. *See* 40 P.S. § 2000.

*Lewis*, 793 A.2d at 149–50 (internal footnote omitted). Because "[t]he No–Fault Act fueled rising insurance costs" and resulted in an "increase in the number of uninsured motorists," the General Assembly replaced the No-Fault Act with the MVFRL. *See id.* at 150.

statement of legislative intent or purpose[,] . . . Pennsylvania courts are unanimous that the legislative intent underlying the MVFRL was to establish a liberal compensatory scheme of underinsured motorist protection." *Nationwide Mut. Ins. Co. v. Cosenza*, 258 F.3d 197, 208 (3d Cir. 2001) (citations omitted); *see also Williams v. GEICO Gov't Emps. Ins. Co.*, 32 A.3d 1195, 1211 (Pa. 2011) (Todd, J., concurring) (explaining that "[t]he [MVFRL] expressly sets forth a remedial public policy to promote the recovery of damages for innocent victims of accidents by mandating that insurers offer [UM and UIM] protection to insureds" (citing 75 Pa. C.S. § 1731(a)). Initially, the MVFRL required, *inter alia*, all auto insurance policies to provide the insured with UIM coverage. *See id.* at 209 (explaining that MVFRL "had previously made the purchase of UIM insurance mandatory"). Then, in 1990, the General Assembly removed this requirement to provide "insureds the choice of saving money on premiums or purchasing more protective coverage, such as UIM coverage." *Id.* (citation omitted). As such, under the current version of the MVFRL, auto insurers are obligated to offer UM/UIM coverage to prospective insureds, but those prospective insureds have the option of whether to purchase UM/UIM coverage.[14] *See Lewis*, 793 A.2d at 150 (citing 75 Pa. C.S § 1731(a)); 75 Pa. C.S. § 1731(a) ("No motor vehicle liability insurance policy shall be delivered or issued for delivery in this Commonwealth, with respect to any motor vehicle registered or principally garaged in this Commonwealth, unless uninsured motorist and underinsured motorist coverages are offered therein or supplemental thereto in amounts as provided in section 1734 (relating to request for lower limits of coverage. Purchase of uninsured

---

[14] The MVFRL defines UM coverage as "protection for persons who suffer injury arising out of the maintenance or use of a motor vehicle and are legally entitled to recover damages therefor from owners or operators of uninsured motor vehicles." 75 Pa. C.S. § 1731(b). UIM coverage is defined as "protection for persons who suffer injury arising out of the maintenance or use of a motor vehicle and are legally entitled to recover damages therefor from owners or operators of underinsured motor vehicles." *Id.* § 1731(c).

motorist and underinsured motorist coverages is optional.").[15] If an insured opts not to purchase UM/UIM coverage, the MVFRL imposes specific requirements on insurers regarding the form and content of those UM/UIM waivers. *See* 75 Pa. C.S. § 1731(b), (b.1), (c), (c.1) (providing language for form waivers of UM/UIM coverage and requirements for waivers of UM/UIM coverage). Overall, the MVFRL "assur[es] either that substantial UM/UIM coverage is provided to insured motorists in Pennsylvania or that an informed waiver/rejection is obtained in a uniform and particularized manner." *Lewis*, 793 A.2d at 152.

When multiple insurance policies cover a single accident, the MVFRL creates priority rules for payment. *See* 75 Pa. C.S. § 1733; *Erie Ins. Exch. v. Backmeier*, 287 A.3d 931, 946 (Pa. Super. 2022) ("Section 1733(a) sets forth the order of priority by which an injured insured may seek UIM benefits."). The first-priority policy, also known as the "host-vehicle policy," is "[a] policy covering a motor vehicle occupied by the injured person at the time of the accident." 75 Pa. C.S. § 1733(a)(1). If there is no first-priority policy or the first-priority policy is insufficient to fully compensate the injured person, the second-priority policy will then pay. A second-priority policy is "[a] policy covering a motor vehicle not involved in the accident with respect to which the injured person is an insured." *Id.* § 1733(a)(2). First-priority policies are related to the vehicle occupied at the time of the accident while second-priority policies relate to the individual injured. *See id.* § 1733(a)(1)–(2).

Section 1733 of the MVFRL

is silent on whether limitations may be placed on the total recovery received from policies of equal priority when stacking has been waived. Section 1733 is also silent on the distinction between stacked and unstacked UIM coverage. Rather, Section 1733 simply sets forth the prioritization for recovery of UIM benefits.

---

[15] Section 1734 provides that "[a] named insured may request in writing the issuance of coverages under section 1731 (relating to availability, scope and amount of coverage) in amounts equal to or less than the limits of liability for bodily injury." 75 Pa. C.S. § 1734.

*Backmeier*, 287 A.3d at 946–47 (internal citations omitted). Thus, when examining an issue relating to stacking, the court must "turn to Section 1738, which deals specifically with the concepts of stacked and unstacked UIM coverage." *Id.* at 947.

Through section 1738, the MVFRL provides for intra- and inter-policy stacking, which is the default coverage available to insureds in Pennsylvania. *See Craley v. State Farm Fire and Cas. Co.*, 895 A.2d 530, 539 (Pa. 2006) ("Section 1738(a) . . . unambiguously provides for inter- as well as intra-policy stacking."); *Gallagher*, 201 A.3d at 137 ("[S]tacked UM/UIM coverage is the default coverage available to every insured and provides stacked coverage on all vehicles and all policies."). Section 1738 states that

> [w]hen more than one vehicle is insured under one or more policies providing [UM/UIM] coverage, the stated limit for [UM/UIM] coverage shall apply separately to each vehicle so insured. The limits of coverages available under this subchapter for an insured shall be the sum of the limits for each motor vehicle as to which the injured person is an insured.

75 Pa. C.S. § 1738(a).[16]

Although 1738(a) provides for intra- and inter-policy stacked coverage, "a named insured may waive coverage providing stacking of [UM/UIM] coverages in which case the limits of coverage available under the policy for an insured shall be the stated limits for the motor vehicle as to which the injured person is an insured." *Id.* § 1738(b). Regarding this waiver, an insurer must provide a "named insured purchasing [UM/UIM] coverage for more than one vehicle under a policy . . . the opportunity to waive the stacked limits of coverage and purchase coverage" limiting

---

[16] The MVFRL defines an "insured" as:

> (1) An individual identified by name as an insured in a policy of motor vehicle liability insurance.
> (2) If residing in the household of the named insured:
> > (i) a spouse or other relative of the named insured; or
> > (ii) a minor in the custody of either the named insured or relative of the named insured.

75 Pa. C.S. § 1702.

UM/UIM coverage to "the stated limits for the motor vehicle as to which the injured person is an insured." *Id.* § 1738(b), (c). If an insured waives stacked UM/UIM coverage, "[t]he premiums . . . shall be reduced to reflect the different cost of such coverage." *Id.* § 1738(c).

The MVFRL mandates the language insurers must use when providing insureds with the opportunity to waive UM/UIM coverage in their auto policies. *See id.* § 1738(d). If an insurer does not use these forms, which must be signed and dated by the first named insured, the insured's rejection of stacking is "void." *Id.* § 1738(e). The MVFRL's form UM waiver is as follows:

### UNINSURED COVERAGE LIMITS

By signing this waiver, I am rejecting stacked limits of uninsured motorist coverage under the policy for myself and members of my household under which the limits of coverage available would be the sum of limits for each motor vehicle insured under the policy. Instead, the limits of coverage that I am purchasing shall be reduced to the limits stated in the policy. I knowingly and voluntarily reject the stacked limits of coverage. I understand that my premiums will be reduced if I reject this coverage.

*Id.* § 1738(d)(1). The MVFRL's form UIM waiver states:

### UNDERINSURED COVERAGE LIMITS

By signing this waiver, I am rejecting stacked limits of underinsured motorist coverage under the policy for myself and members of my household under which the limits of coverage available would be the sum of limits for each motor vehicle insured under the policy. Instead, the limits of coverage that I am purchasing shall be reduced to the limits stated in the policy. I knowingly and voluntarily reject the stacked limits of coverage. I understand that my premiums will be reduced if I reject this coverage.

*Id.* § 1738(d)(2).

Overall, section 1738(d) "has the salutary effect of providing insureds with detailed notice and knowledge of their rights to UM/UIM coverage absent such formal waiver." *Gallagher*, 201 A.3d at 201. Yet, as evidenced by the language of these two form waivers, they do not reference inter-policy stacking despite the MVFRL expressly providing for intra- and inter-policy stacking.

*See Craley*, 895 A.2d at 541–42 (concluding that language in section 1738(d)(1)–(2) does not put insureds on notice that they are waiving inter-policy stacking because language only pertains to intra-policy stacking). This inconsistency has led to extensive litigation in Pennsylvania federal and state courts for years.

**2.      The Development of the Caselaw Relating to the Household Vehicle Exclusion and Stacking**

a.      <u>The Validity of Household Vehicle Exclusions</u>

Household vehicle exclusions are

> one of several types of exclusionary clauses included in motor vehicle insurance policies providing [UM] coverage. Specifically, the household vehicle exclusion exempts from [UM] coverage any coverage for bodily injury sustained while occupying a vehicle owned by the named insured, the named insured's spouse, or a resident relative of the named insured, but not insured under the policy in question.

*Id.* at 531 n.1 (internal citation omitted). "The purpose of the household vehicle exclusion is to limit an insurer's liability for accidents which involve vehicles that are not insured under its policy but are more likely to be driven or occupied by an insured than third-party vehicles because they are owned by a household member." *Estate of Demutis v. Erie Ins. Exch.*, 851 A.2d 172, 177 (Pa. Super. 2004) (quoting trial court opinion); *see also Couch* § 114:26 ("The purpose of a family or household exclusion clause is to exempt the insurer from being required to cover claims by those persons to whom the insured, on account of close family ties, would be apt to be partial in case of injury. The exclusion serves to protect the insurer against collusive or cozy claims.").

Since the MVFRL originally "required uninsured motorist and underinsured motorist coverages as part of every motor vehicle liability insurance policy issued in Pennsylvania,"[17] "litigation [ensued] involving claimants' eligibility for [UIM] benefits and exclusionary clauses in

---

[17] As explained above, even though the General Assembly amended the MVFRL so that UM/UIM insurance are no longer required in auto policies, the insurer is still obligated to offer it to prospective insureds.

automobile insurance policies." *Paylor v. Hartford Ins. Co.*, 640 A.2d 1234, 1236 (Pa. 1994). Unsurprisingly, challenges to household vehicle exclusions, which were also identified as "family car exclusions," arose in Pennsylvania courts in the late 1980s and into the early 1990s, *see, e.g.*, *Marroquin v. Mutual Ben. Ins. Co.*, 591 A.2d 290 (Pa. Super. 1991); *Newkirk v. United Servs. Auto. Ass'n*, 564 A.2d 1263 (Pa. Super. 1989); however, these challenges did not reach the Pennsylvania Supreme Court until 1994, when the Court decided *Paylor v. Hartford Insurance Co.* and *Windrim v. Nationwide Insurance Co.*, 641 A.2d 1154 (Pa. 1994). And when these challenges finally reached the Pennsylvania Supreme Court, the appellants' arguments to the Court were not based on the ambiguity of the exclusions in the policies; rather, they were primarily based on contentions that the exclusions violated public policy. In both decisions, the Court concluded that the exclusions did not violate public policy.[18]

---

[18] In *Paylor*, the Court addressed "a question of first impression relating to the enforceability of a 'family car exclusion' which excludes a vehicle owned by or furnished or available for the regular use of the named insured or any family member from the definition of an underinsured motor vehicle." 640 A.2d at 1234. In addressing this question, the Court pointed out that "the dispute center[ed] on whether the [exclusion] violates public policy" because the parties did not contest "that the exclusion[] . . . in the . . . policy is clear and unambiguous." *Id.* at 1235. The Court then reviewed a "litany of cases" from the Pennsylvania Superior Court, in which it addressed exclusionary clauses in automobile insurance policies. *Id.* at 1236–40. Those cases "demonstrate[d] that the 'family car exclusion' is not necessarily violative of public policy or the legislative intent underlying the MVFRL." *Id.* at 1240. Instead, "[t]he enforceability of the exclusion is dependent upon the factual circumstances presented in each case." *Id.*

The facts in *Paylor* involved a husband and wife who were killed in a single-vehicle accident while operating their mobile home. *See id.* at 1235. The couple had auto insurance on the mobile home, and they were also named insureds on another policy which insured their other three vehicles. *See id.* The couple's daughter, acting as administratrix of her mother's estate, was able to recover the limits of coverage under the policy covering the mobile home. *See id.* However, when she tried to recover UIM benefits under the policy covering her parents' other three vehicles, the insurer of that multi-vehicle policy denied the claim. *See id.* This denial was "based upon the family car exclusion contained in the policy, which provided that neither 'uninsured motor vehicle' nor 'underinsured motor vehicle' includes any vehicle '[o]wned by or furnished or available for the regular use of [the named insured] or any family member.'" *Id.* (alterations in original).

Among these facts, the Court focused on the administratrix's attempt to recover benefits from policies that were in the name of the same insureds, her parents. *See id.* at 1241. Therefore, the Court concluded that

> the facts of this case fall within the limited exception recognized in *Marroquin* which permits the family car exclusion to be enforced in cases where the plaintiff is attempting to convert underinsured motorist coverage into liability coverage. The application of this limited exception in this case serves to promote the legislative intent of the MVFRL and the expression of public policy articulated in the case law of Pennsylvania.

*Id.* at 1241 (footnote omitted).

Four years after deciding that the household vehicle exclusions at issue did not violate public policy in *Paylor* and *Windrim*, the Pennsylvania Supreme Court again addressed the enforceability of a household vehicle exclusion when it decided *Eichelman v. Nationwide Insurance Co.* In *Eichelman*, the Court addressed

> whether a person who has voluntarily elected to forego [UIM] coverage on his own vehicle is precluded from recovering [UIM] benefits from separate automobile insurance policies issued to family members with whom he resides as a result of a "household exclusion" clause excluding [UIM] coverage for bodily injury suffered while occupying a motor vehicle not insured for [UIM] coverage.

711 A.2d at 1006–07.[19] The "household exclusion" clause at issue in the case provided that "coverage d[id] not apply to: . . . Bodily injury suffered while occupying a motor vehicle owned

---

Approximately a month after deciding *Paylor*, the Court "expanded the applicability of the 'household exclusion'" in *Windrim*. *Eichelman v. Nationwide Ins. Co.*, 711 A.2d 1006, 1009 (Pa. 1998). In *Windrim*, the plaintiff was operating his uninsured vehicle when it was allegedly involved in an accident with a hit-and-run driver. 641 A.2d at 1155. The plaintiff then sought UM benefits under his mother's auto policy because he was a resident relative in her household. *See id.* The insurer of his mother's policy denied coverage because the policy excluded UM coverage for "bodily injury while occupying . . . a motor vehicle owned by you or a relative living in your household, but not insured for Uninsured or Underinsured Motorists coverage under this policy." *Id.* (quoting policy). As in *Paylor*, the appellant did not argue that the exclusion was ambiguous; thus, the Court only had to address whether it violated public policy. *See id.* at 1155, 1157.

In addressing the public policy issue, the Court pointed out that it was "confronted with a situation where an individual was operating *his own* uninsured vehicle at the time of the accident" and an auto policy with "an unambiguous exclusionary provision." *Id.* at 1157. The Court concluded that the exclusion in the mother's policy was valid and enforceable. *See id.* at 1158. The court explained that

> [o]ur conclusion is bolstered by the fact that [the plaintiff's] argument, if accepted, would actually contravene the legislative intent behind the MVFRL by serving as a disincentive to insure vehicles. . . . [A] possible result . . . is that many individuals owning several vehicles will purchase coverage for only one of them. Likewise, relatives living with an insured will be less inclined to purchase insurance for their vehicles, instead seeking uninsured motorist coverage under their relative's insurance policy. Clearly, the General Assembly did not envision nor intend such abuses of the system when it enacted the MVFRL.

*Id.* (internal citation and quotation marks omitted).

[19] In *Eichelman*, the then-31-year-old appellant was operating his motorcycle when he was involved in an accident with an underinsured motorist. 711 A.2d at 1007. The appellant did not have UIM coverage on his motorcycle, but he was residing with his mother and her husband at the time of the accident, and they had two auto policies that provided for UIM coverage for the named insureds and any relatives living with the named insureds. *See id.* The appellant submitted UIM claims under these two policies, and the insurer denied those claims based on the household vehicle exclusion in the policies. *See id.*

by you or a relative not insured for [UIM] coverage under this policy; nor to bodily injury from being hit by any such motor vehicle." *Id.* at 1007 (quoting policy).

In reviewing this exclusion, the Court pointed out that the appellant had essentially conceded that the household exclusions at issue were unambiguous insofar as they "bar[red his] recovery of [UIM] benefits from the[] two policies since he suffered his injuries while operating a motor vehicle not insured for [UIM] coverage." *Id.* Thus, "the . . . dispute center[ed] on whether the 'household exclusion' provision violate[d] public policy." *Id.* The Court concluded that it did not.

The Court explained that analyzing whether the exclusion violated public policy required the Court to review three issues: (1) "whether there is a unanimity of opinion that the 'household exclusion' language contained in the two policies issued by [the insurer] violates public policy," (2) whether the exclusion "is contrary to the public health, safety, morals or welfare of the people," and (3) whether the exclusion was inconsistent with the legislative intent behind the MVFRL. *See id.* at 1008–10. As to the first issue, the Court pointed to "the recent 'household exclusion trilogy" in *Paylor*, *Windrim*, and a *per curiam* order in *Hart v. Nationwide Insurance Co.*, 663 A.2d 682 (Pa. 1995), as showing "a lack of unanimity of opinion against the 'household exclusion' language at issue."[20] *Id.* at 1008, 1009. Concerning the second issue, the Court determined that the "'household exclusion' language in the two policies" was not "so obviously against the public

---

[20] The Court explained that *Hart* involved facts which

> were distinguishable from *Windrim* in that the motor vehicle which Hart was driving was insured under a separate policy from that which he sought to obtain underinsured benefits. Nationwide invoked a "household exclusion" in the policy from which Hart sought underinsured benefits. Moreover, the "household exclusion" language in *Hart* was virtually identical to the "household exclusion" language at issue in the case *sub judice*. While the lower courts voided the "household exclusion" as against public policy, this Court reversed those decisions on the basis of its holding in *Windrim*.

*Eichelman*, 711 A.2d at 1009.

health, safety, morals or welfare of the people that the clause should not be enforced on public policy grounds." *Id.* at 1009.

Regarding the third and final issue, the Court concluded that the household exclusion was not against the legislative intent of the MVFRL:

> [U]nderinsured motorist coverage serves the purpose of protecting innocent victims from underinsured motorists who cannot adequately compensate the victims for their injuries. That purpose, however, does not rise to the level of public policy overriding every other consideration of contract construction. As this Court has stated, "there is a correlation between premiums paid by the insured and the coverage the claimant should reasonably expect to receive." *Hall v. Amica Mut. Ins. Co.*, 538 Pa. 337, 349, 648 A.2d 755, 761 (1994). Here, appellant voluntarily chose not to purchase underinsured motorist coverage. In return for this choice, appellant received reduced insurance premiums. As appellant admitted in his answers to interrogatories, he was not aware that his mother and her husband had insurance policies which could have possibly covered him. Moreover, it is not readily apparent that appellee knew of appellant's existence when it issued the two insurance policies or that the insurance premium charged to his mother and her husband reflected an intent on their part to provide underinsured motorist coverage to appellant. Thus, this Court concludes that giving effect to the "household exclusion" in this case furthers the legislative policy behind underinsured motorist coverage in the MVFRL since it will have the effect of holding appellant to his voluntary choice.
>
> Allowing the "household exclusion" language to stand in this case is further bolstered by the intent behind the MVFRL, to stop the spiralling costs of automobile insurance in the Commonwealth. If appellant's position were accepted, it would allow an entire family living in a single household with numerous automobiles to obtain underinsured motorist coverage for each family member through a single insurance policy on one of the automobiles in the household. If this result were allowed, it would most likely result in higher insurance premiums on all insureds (even those without family members living at their residence) since insurers would be required to factor expanded coverage cost into rates charged for underinsured motorist coverage. Thus, allowing the "household exclusion" language of the two insurance policies at issue to bar recovery by appellant of underinsured motorist benefits is consistent with the intent behind the enactment of the MVFRL.

*Id.* at 1011. Therefore, since the household exclusion was consistent with the legislative intent behind the MVFRL, there was not "a unanimity of opinion" that the household exclusion language at issue violated public policy, and the exclusion was not contrary to the public health, safety,

morals or welfare of the people, the Court concluded that the two household exclusions were valid and decided in favor of the insurer. *See id.*

Following *Eichelman*, "a clear and unambiguous household exclusion [wa]s a valid mechanism for limiting UIM coverage within an insurance policy" "in the absence of a violation of public policy." *Rudloff v. Nationwide Mut. Ins. Co.*, 806 A.2d 1270, 1273 (Pa. Super. 2002) (en banc). "Accordingly, a party seeking to circumvent the household exclusion [had to] articulate a public policy that would be contravened by enforcement of the exclusion under the facts of the case." *Id.*; *see also Burstein v. Prudential Prop. and Cas. Ins. Co.*, 809 A.2d 204, 207 (Pa. 2002) ("The plain language of th[e household vehicle exclusion in the policy at issue] clearly and unambiguously delineates an exclusion for regularly used, non-owned vehicles. Indeed, the parties agree that the exclusion, if applied, severs the portability of Appellees' UIM coverage to any regularly used, non-owned cars. As a result, the policy simply does not cover Appellees' claim. Thus, their only remaining avenue of relief is to demonstrate that the regularly used, non-owned car exclusion and its contractual restraint on UIM portability violate a clearly expressed public policy.").[21]

---

[21] The requirement that a party seeking to avoid an exclusion identify a specific public policy contravened if the exclusion emanates from "the formless face of public policy." *Burstein*, 809 A.2d at 207. As such, courts should carefully ascertain a public policy

> by reference to the laws and legal precedents and not from general considerations of supposed public interest. As the term 'public policy' is vague, there must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy. . . . Only dominant public policy would justify such action. In the absence of a plain indication of that policy through long governmental practice or statutory enactments, or of violations of obvious ethical or moral standards, the Court should not assume to declare contracts . . . contrary to public policy. The courts must be content to await legislative action.

*Muschany v. United States*, 324 U.S. 49, 66–67 (1945) (internal footnotes and citations omitted).

b.      Waivers of Inter-Policy Stacking

With the Pennsylvania Supreme Court affirming the validity of the household vehicle exclusion, the next phase of litigation relating to this exclusion was how it related, if at all, to stacking waivers under the MVFRL. But before that could occur, the Court had to resolve the issue of whether an insured could inter-policy stack under the MVFRL and, if so, how the insured could do it. The Court took up this issue in *Craley v. State Farm Fire and Casualty Co.*, where the Court indicated an intent to address

> the interplay between coverage exclusions in motor vehicle insurance policies, including the household vehicle exclusion . . ., and the statutory provision of the [MVFRL] . . . providing "named insureds" the ability to waive "stacked" [UM] coverage, 75 Pa. C.S. § 1738, which the Superior Court has found inapplicable to inter-policy stacking, the stacking of benefits provided by two or more policies.

895 A.2d 530, 531–32 (Pa. 2006).[22]

In *Craley*, a driver was operating her insured vehicle with her son and mother-in-law as passengers when it was struck by an uninsured drunk driver. *See id.* at 533. The accident tragically killed the driver and injured her son and mother-in-law. *See id.* The driver's husband, as administrator of her estate and on behalf of their son, and the mother-in-law requested and received UM benefits on the driver's policy for the vehicle she was driving at the time of the accident. *See id.* These UM benefits were insufficient to fully compensate them for their injuries, so they also filed a UM claim under the husband's auto policy, which he had purchased from the same insurer who insured his wife's vehicle. *See id.* The husband was the named insured under this policy, and his wife, mother-in-law, and son were all "insureds" under the policy as resident relatives of the husband. *See id.*

---

[22] Despite expressing the intent to address the interplay between household vehicle exclusions and stacking, the majority decision focused only on stacking waivers. Only Justice Eakin addressed the household vehicle exclusion in the husband's policy. *See Craley*, 895 A.2d at 544 (Eakin, J., concurring) (concluding that household vehicle exclusion in husband's policy should be enforced).

In response to these UM claims, the insurer filed a declaratory judgment action in the Court of Common Pleas. *See id.* The insurer argued that it had no obligation to pay on the claims under the husband's policy because (1) he had waived both intra- and inter-policy stacking through executing a waiver that conformed with section 1738(d) of the MVFRL and (2) his policy contained a household vehicle exclusion relating to non-stacked UM coverage.[23] *See id.* The trial court rejected both arguments and decided in favor of the claimants.[24] *See id.* at 534–35. The insurer then appealed to the Superior Court, which ultimately reversed the trial court's decision because it found the household exclusion to be enforceable.[25] *Id.* at 536. The claimants then petitioned for the Pennsylvania Supreme Court to hear the case, which the Court granted.

The Court first addressed whether an insured could waive inter-policy stacking under section 1738(b). After examining the statutory language in section 1738 and considering the legislative purposes of the MVFRL, with the most significant purpose being cost containment, the Court concluded that section 1738(b) does not "ban the waiver of stacking in single-vehicle policies, and thus inter-policy stacking."[26] *Id.* at 540.

---

[23] The parties stipulated that the husband "received a reduced premium as a result of signing the stacking waiver." *Craley*, 895 A.2d at 534.

[24] The trial court concluded that the statutorily mandated waiver in section 1738(d) did not apply to intra-policy stacking, and it found the household vehicle exclusion void as against public policy based on the facts of the case. *See id.* at 534–35.

[25] The Superior Court determined that the household exclusion was enforceable because its prior decisions, along with those of the Pennsylvania Supreme Court, "leaves little doubt as to the validity of household vehicle exclusions." *Id.* at 536 (quoting *State Farm Fire & Cas. Co. v. Craley*, 844 A.2d 573, 574 (Pa. Super. 2004)).

[26] The Court pointed out that section 1738(a) "unambiguously provides for inter- as well as intra-policy stacking, thus expressing the clear intention of the General Assembly to compel insurers to provide stacking coverage absent a valid waiver." *Id.* at 539 (citing 75 Pa. C.S. § 1738(a)). The Court then indicated that although section 1738(b) allows insureds to waive stacked coverage, it, unlike section 1738(c), was "silent as to its application to single-vehicle and multiple-vehicle policies." *Id.* at 539–40 (citing 75 Pa. C.S. § 1738(b)). Nevertheless, the Court explained that to the extent subsection (b) was ambiguous, the Court would have to examine the legislative purposes underlying the MVFRL, with the most significant of those purposes being cost containment. *See id.* at 540. With this purpose in mind, the Court stated that it would "resolve any ambiguity present in subsection (b) in favor of allowing consumers the choice to waive the coverage and thereby reduce their premiums." *Id.*

The Court then analyzed how an insured can waive inter-policy stacking under section 1738(b). *See id.* The Court explained that "[g]iven the form required by subsection (d), the sanction provided in subsection (e), and the imperative language granting stacking to all insureds in subsection (a), it is readily apparent that some form of knowing waiver must occur before we allow enforcement of an inter-policy stacking waiver."[27] *Id.* at 541. Since the husband in the case *sub judice* had executed a waiver conforming to section 1738(d), the Court scrutinized that form to determine whether it included inter-policy stacking, and ultimately concluded that it did not. *See id.* ("While the language of subsection (d) is unambiguous in regard to the sufficiency of waiver of intra-policy stacking as it speaks to stacking as 'the sum of the limits for each motor vehicle insured under *the policy*,' the language does not clearly address an inter-policy stacking waiver, which would involve the limits for each motor vehicle insured under *the policies*." (quoting 75 Pa. C.S. § 1738(d))).

Although the waiver form did not apply to inter-policy stacking, the Court still had to "determine whether, under the circumstances of this case, the form put [the husband] on clear notice that he was waiving inter-policy stacking." *Id.* at 541. The Court found that the husband was on notice because the waiver informed him that his premiums would be reduced if he waived stacked coverage and, as the husband only had one vehicle on his policy, he "could not have thought he was receiving a reduced premium for waiving intra-policy stacking with only one vehicle on 'the policy.'" *See id.* at 541–42. Thus, "[a]bsent the applicability of intra-policy waiver,

---

[27] Regarding subsections (d) and (e), the Court remarked that

> Subsection (d), which provides the necessary waiver form for multiple-vehicle policyholders, indicates that the legislature felt it necessary to require insurers to provide insureds with specific language in written form to ensure ample notice of the benefits to be waived. Moreover, the legislature imposed a significant sanction on an insurance company that deviates from the form, voiding any "rejection form that does not comply with this section."

*Craley*, 895 A.2d at 540–41 (quoting 75 Pa. C.S. § 1738(e)).

the only interpretation fairly available to [the husband] was that his premium-reducing waiver applied to inter-policy stacking." *Id.* at 542. Accordingly, the Court "conclude[d] that the waiver [was] valid and enforceable under the facts of this case."[28] *Id.*

Chief Justice Cappy, now deceased, wrote in a concurring opinion that while he was "constrained to join the result reached by the Majority Opinion[, he wrote] separately in order to express [his] views regarding the inconsistency between the written rejection form found at [section] 1738(d)(1) and the remainder of Section 1738 of the [MVFRL]." *Id.* at 542–43. This inconsistency related to the MVFRL's clear intent to provide for intra- and inter-policy stacking and to provided insureds with the option to waive intra- and inter-policy stacking, yet the section 1738(d) waiver form did not reference inter-policy stacking. *See id.* at 543. To remedy this inconsistency, Chief Justice Cappy

> respectfully submit[ted] that the General Assembly could cure the inconsistency between the written rejection form and the remainder of Section 1738 if the General Assembly would amend the written rejection form as follows:

---

[28] The Court explained that

> [t]his conclusion is supported by the public policy concern driving our decisions in the household vehicle exclusion cases. In those cases, we held that the public policy of cost-containment functions to protect insureds against forced underwriting of unknown risks that insureds have neither disclosed nor paid to insure, and prevents insureds from receiving gratis coverage. Thus, insurers are not "compelled to subsidize unknown and uncompensated risks by increasing insurance rates comprehensively.

*Craley*, 895 A.2d at 542 (internal citations and quotation marks omitted). The Court also noted that there were unresolved questions relating to the proper conclusion if the policy at issue covered more than one vehicle:

> If a named insured insures some cars under one policy ("the policy") and others under a separate policy ("the second policy") and signs the form provided in subsection (d) which refers to the waiver of stacking "for each motor vehicle insured under the policy," that named insured reasonably could assume that he received a reduced premium for waiver of the stacking of the limits regarding the vehicles insured by "the policy" with no knowledge that he was waiving stacking of the applicable limits of "the policy" to "the second policy," despite paying premiums on both policies. We urge the legislature or the Commissioner to clarify whether and how insurers may secure a valid waiver in such a case.

*Id.* at 542 n.18.

> By signing this waiver, I am rejecting stacked limits of uninsured
> motorist coverage under the policy for myself and members of my
> household under which the limits of coverage available would be
> the sum of limits for each motor vehicle insured under the policy or
> the policies. Instead, the limits of coverage that I am purchasing
> shall be reduced to the limits stated in the policy. I knowingly and
> voluntarily reject the stacked limits of coverage. I understand that
> my premiums will be reduced if I reject this coverage.

*Id.*

c.      The Interplay Between Household Vehicle Exclusions, Inter-Policy Stacking, and
Waivers of Inter-Policy Stacking

Approximately 13 years after *Craley*, the Pennsylvania Supreme Court, in *Gallagher v. GEICO Indemnity Co.*, 201 A.3d 131 (Pa. 2019), addressed the interplay between household vehicle exclusions and *Craley*'s requirement that "some form of knowing waiver must occur" before a court can enforce an inter-policy stacking waiver. 895 A.2d at 541. More specifically, the Court in *Gallagher* had to "determine whether a 'household vehicle exclusion' contained in a motor vehicle insurance policy violates Section 1738 of the [MVFRL] . . . because the exclusion impermissibly acts as a *de facto* waiver of stacked [UM/UIM] . . . coverages." 201 A.3d at 132.

The facts of *Gallagher* involved a motorcyclist who suffered severe injuries when his motorcycle was struck by an underinsured pickup truck driver. *See id.* The motorcyclist had two auto policies with the same insurer—one covering the motorcycle and the other covering his two automobiles. *See id.* at 132–33. The motorcyclist paid for stacked UM and UIM coverage in both policies. *See id.* at 133. After his resolution with the tortfeasor failed to fully compensate him for his injuries, the motorcyclist then submitted claims for UIM coverage with his insurer, which paid the UIM limits available under the motorcycle policy but denied coverage for stacked UIM benefits under the policy covering the two vehicles. *See id.* The insurer based its denial "on a household vehicle exclusion found in an amendment" to this policy that stated as follows: "This

32

coverage does not apply to bodily injury while occupying or from being struck by a vehicle owned or leased by you or a relative that is not insured for [UIM] Coverage under this policy." *Id.* (citation omitted).

After the denial of his UIM claim, the motorcyclist filed a complaint against the insurer in the Court of Common Pleas. *See id.* The trial court and, on appeal, the Superior Court decided in favor of the insurer based on the household vehicle exclusion. *See id.* at 134–35 (describing that both trial court and Superior Court primarily relied on *Gov't Emps. Ins. Co. v. Ayers*, 955 A.2d 1025 (Pa. Super. 2008), in enforcing household vehicle exclusion). The motorcyclist petitioned for allowance of appeal, which the Pennsylvania Supreme Court granted to address the enforceability of the household vehicle exclusion under the facts of the case.

In addressing whether the household vehicle exclusion should be enforced, the Court indicated that it would apply "general principles of contract interpretation" to the extent it was necessary to interpret the vehicles' policy and be "guided by the Statutory Construction Act, 1 Pa. C.S. §§ 1501–1991," to the extent it was necessary to interpret the MVFRL. *Id.* at 137. The Court first looked to the MVFRL and explained that "stacked UM/UIM coverage is the default coverage available to every insured and [section 1738(a)] provides stacked coverage on all vehicles and all policies." *Id.* The Court then determined that the household vehicle exclusion,

> buried in an amendment, is inconsistent with the unambiguous requirements Section [sic] 1738 of the MVFRL under the facts of this case insomuch as it acts as a *de facto* waiver of stacked UIM coverage provided for in the MVFRL, despite the indisputable reality that [the motorcyclist] did not sign the statutorily-prescribed UIM coverage waiver form. Instead, [the motorcyclist] decided to purchase stacked UM/UIM coverage under both of his policies, and he paid [the insurer] premiums commensurate with that decision. He simply never chose to waive formally stacking as is plainly required by the MVFRL.

*Id.* at 138.

The Court went on to explain:

> One of the insurance industries' age-old rubrics in this area of the law is that an insured should receive the coverage for which he has paid. Here, [the insurer] argues against this maxim by invoking the household vehicle exclusion to deprive [the motorcyclist] of the stacked UIM coverage that he purchased. This action violates the clear mandates of the waiver provisions of Section 1738. Indeed, contrary to Section 1738's explicit requirement that an insurer must receive an insured's written acknowledgement that he knowingly decided to waive UM/UIM coverage, the household vehicle exclusion strips an insured of default UM/UIM coverage without requiring an insurer to demonstrate, at a bare minimum, that the insured was even aware that the exclusion was part of the insurance policy. This practice runs contrary to the MVFRL and renders the household vehicle exclusion invalid and unenforceable. In fact, this case is a prime example of why household vehicle exclusions should not and cannot operate as a pretext to avoid stacking.

> Often in these cases, an insurer contends that it should not have to provide stacked coverage when an insured purchases UM/UIM coverage on his motorcycle in Policy A, and then purchases UM/UIM coverage on passenger cars in Policy B. The obvious argument is that the insurer of the passenger cars is unaware of the potentiality of stacking between the car policy and the motorcycle policy. Here, however, [the insurer] was aware of this reality, as it sold both of the policies to [the motorcyclist] and collected premiums for stacked coverage from him. To the extent that [the insurer's] premium would be higher on an automobile policy because of stacking with a motorcycle policy, all [the insurer] has to do is quote and collect a higher premium. There simply is no reason that insurers cannot comply with the Legislature's explicit directive to offer stacked UM/UIM coverage on multiple insurance policies absent a knowing Section 1738 waiver and still be fairly compensated for coverages offered and purchased.

*Id.*

Approximately 18 months after deciding *Gallagher*, the Pennsylvania Supreme Court, in *Donovan v. State Farm Mutual Automobile Insurance Co.*, again addressed inter-policy stacking, waivers of inter-policy stacking, and household vehicle exclusions after granting review of three questions relating to the MVFRL that were certified by the Third Circuit Court of Appeals. 256 A.3d 1145, 1146 (Pa. 2021).[29] Those questions related to a factual scenario where a motorcyclist

---

[29] Although the Pennsylvania Supreme Court granted review to answer three questions, the third question, which dealt with the mother's policy's coordination of benefits provision, *see Donovan*, 256 A.3d at 1146, 1160–61, and its resolution, are irrelevant to the issues this court is addressing in the instant case. As such, this court's review of *Donovan* is limited to discussing the Court's resolution of the Third Circuit's first two questions.

suffered severe injuries in an accident caused by an underinsured motorist. *See id.* at 1147. After obtaining UIM benefits under his policy covering the motorcycle, the motorcyclist submitted a claim for UIM benefits under his mother's policy because he was a resident relative under that policy. *See id.* His mother's policy insured three vehicles but not the motorcycle; she had signed a waiver of stacked UIM coverage which comported with section 1738(d)'s waiver language; and her policy included a household vehicle exclusion. *See id.* at 1147–48. The insurer ended up denying UIM coverage to the motorcyclist based on his mother's stacking waiver. *See id.* at 1149.

Based on these facts, the first question the Court had to address was "whether [the mother's] signature on the form required by Section 1738(d) results in the waiver of [the motorcyclist's] right to [inter-policy] stacked coverage under [her] Auto Policy." *Id.* at 1152. The Court noted that its "review of this question [was] rooted" in *Craley. Id.* The Court then discussed the Majority Opinion and Chief Justice Cappy's concurring opinion in *Craley* and remarked that in the 15 years after that decision, "the General Assembly has neither adopted Chief Justice Cappy's suggested addition [to Section 1738(d)] nor has it clarified the language in Section 1738(d)." *Id.* at 1154.

After describing the competing arguments on the waiver of inter-policy stacking issue, the Court explained that it was "bound by the language of the General Assembly" and could not simply amend the MVFRL "even in a case, such as this one, where the statutory language seemingly falters in fully achieving its goal." *Id.* at 1154–57. The Court also noted that the General Assembly contemplated allowing for waivers of inter-policy stacking in multiple-vehicle policies because (1) the General Assembly "appears to have intended to grant all insureds the opportunity to reduce their premiums by waiving stacked UM/UIM coverage as set forth in Section 1738(b)"; (2) insureds have the ability to waive intra- and inter- policy stacking, as long as it is a knowing

waiver; and (3) "[t]here is no indication in Section 1738 that the General Assembly intended to excise from the ability to waive inter-policy stacked coverage the subset of insureds who insure multiple vehicles on a policy." *Id.* at 1157. Yet, because the Court was "bound by the language of Section 1738(d)'s waiver form," which

> informs insureds that they are waiving intra-policy stacking as they will not be provided the sum of the limits for each motor vehicle under the policy. It does not, however, alert insureds that they are waiving the ability to stack the coverage for which premiums were paid in "this policy" on top of the coverage available under a separate policy. In other words, it does not provide the necessary knowing waiver of inter-policy stacked coverage, absent the single-vehicle situation in *Craley*.

*Id.* Therefore, the Court concluded that the mother had not knowingly waived inter-policy stacking on her multi-vehicle policy by executing the stacking waiver required by section 1738(d).[30] *Id.*

Since the Court found the mother's stacking waiver invalid as to inter-policy stacking, the Court next addressed the Third Circuit's second question: whether the household vehicle exclusion would preclude the motorcyclist from recovering inter-policy stacked UIM coverage under his mother's policy. *See id.* The Court explained that the motorcyclist's accident and injuries would be excluded based on the plain language of the exclusion. *See id.* at 1158. However, the issue was whether the exclusion was enforceable after *Gallagher*. *See id.* The Court determined that it was not:

> After review, we find the logic of the case at bar indistinguishable from that in *Gallagher*. In both cases, the insured did not validly waive inter-policy stacking. Whether the insured did not sign a waiver, as in *Gallagher*, or signed a deficient

---

[30] Despite reaching this conclusion, the Court acknowledged the difficulty faced by insurers after its decision:

> We recognize that insurers are placed in a Catch-22 as they are required to provide insureds the opportunity to waive UM/UIM stacking but without the ability to enforce the insureds' waiver of inter-policy stacked coverage in multi-vehicle policies because the statute mandates the use of the Section 1738(d) form. The remedy, however, is not with the courts but with the General Assembly, which has the power to amend its language to provide for waiver of inter-policy stacking on multi-vehicle polices. As in *Craley*, we again call on the Legislature to clarify the Section 1738(d) waiver language and its application to inter-policy UM/UIM stacking.

*Donovan*, 256 A.3d at 1157.

waiver as to inter-policy stacking, as in the case at bar, the result is the same: the policy defaults to inter-policy stacking of UM/UIM coverage. In either case, the household vehicle exclusion cannot operate as a *de facto* waiver of inter-policy stacking because it fails to provide the insured with a knowing waiver of that coverage. Accordingly, as in *Gallagher*, the household vehicle exclusion cannot be enforced to waive inter-policy stacking in regard to [the mother's] Auto Policy as it does not comply with the requirements for waiver of stacking under Section 1738(d).

*Id.* at 1160. The Court then returned the case to the Third Circuit.[31]

The final decision that this court must discuss on this exploration through more than 20 years of decisions addressing household vehicle exclusions, inter-policy stacking, and inter-policy stacking waivers is the recent decision by the Pennsylvania Supreme Court in *Erie Insurance Exchange v. Mione*, No. 89 MAP 2021, 2023 WL 2008314 (Pa. Feb. 15, 2023). Like many of the recent cases addressing inter-policy stacking issues, *Mione* involved a motorcyclist who was injured after a collision with an underinsured motorist. 2023 WL 2008314, at *1. Although the motorcycle did not have UM/UIM coverage, the motorcyclist had a single-vehicle policy on a car jointly owned with his wife, and their adult daughter lived with them and had a single-vehicle policy covering her car. *See id.* Both policies (1) were insured by the same insurer, (2) had UM/UIM coverage (and the policy on the jointly owned car had stacked UM/UIM coverage), and (3) had "household vehicle exclusions barring UM/UIM coverage for injuries sustained while operating a household vehicle not listed on the policy under which benefits are sought. *See id.*

The insurer denied the motorcyclist's claims for UIM benefits under both policies based on the household vehicle exclusions. *See id.* at *2. The insurer then filed an action in the Court of

---

[31] Upon the case's return to the Third Circuit, the Third Circuit addressed the coverage issue. *See Donovan*, 2022 WL 473025 at *1–3. The Third Circuit explained that it was bound to "follow Pennsylvania substantive law as interpreted by its Supreme Court." *Id.* at *3 (citing *Crystallex Int'l Corp. v. Petroleos de Venez., S.A.*, 879 F.3d 79, 84 (3d Cir. 2018)). Applying the Supreme Court's resolution of the certified questions meant that the mother did not validly waive inter-policy stacking and the household vehicle exclusion was inapplicable because it acted as a *de facto* waiver of stacking. *See id.* Therefore, the court concluded that the motorcyclist was permitted to stack the UIM benefits from his mother's policy. *See id.*

Common Pleas in which it sought a declaratory judgment that it was not obligated to pay UIM benefits to the motorcyclist. *See id.* The trial court determined that *Eichelman* controlled, and because the motorcyclist had waived UIM coverage for his motorcycle, the household vehicle exclusion should be enforced. *See id.* at *3. The trial court also concluded that *Gallagher* was distinguishable because the motorcyclist there had purchased UM/UIM insurance on the motorcycle, whereas UM/UIM insurance was waived in this case. *See id.* The motorcyclist then appealed from this decision to the Superior Court, which affirmed the trial court. *See id.* The motorcyclist next filed a petition for allowance of appeal with the Pennsylvania Supreme Court, which granted the petition "to consider whether the lower courts erred in distinguishing *Gallagher* and applying *Eichelman*." *Id.* at *4.

After briefly indicating that its "analysis here turns upon Section 1738 of the MVFRL," the Court proceeded to discuss *Gallagher*. *Id.* The Court explained that

> [i]n *Gallagher*, this Court concluded that enforcing a household vehicle exclusion under the circumstances of that case would conflict with Section 1738's explicit waiver regime, where stacking is assumed to be included in a policy unless the named insured explicitly waives it in accordance with the statute. In so ruling, the Court underscored that "Gallagher decided to purchase stacked UM/UIM coverage *under both of his policies*, and he paid GEICO premiums commensurate with that decision." Thus, the holding turned on the fact that "Gallagher did not sign the statutorily-prescribed UIM stacking waiver form for either of his GEICO policies" and the fact that "he would have received the UIM coverage that he bought and paid for under both of his GEICO policies pursuant to Subsection 1738(a) of the MVFRL, save for the 'household vehicle exclusion[.]'

*Id.* (internal footnotes omitted). The Court then explained that *Gallagher* was inapplicable because the case *sub judice* did not involve stacking insofar as the claimants had not yet received UIM benefits; instead, "their theory [was] that one or both of the household policies can provide UIM coverage *in the first instance*." *Id.* The policies could not provide UIM coverage in the first instance because of the household vehicle exclusions. *See id.* Thus, because the case did not involve an

attempt "to stack UIM benefits from the household policies on top of UIM benefits from the motorcycle policy, Section 1738's rules for waiving stacking—which were the basis for this Court's decision in *Gallagher*—[we]re simply not implicated." *Id.* Furthermore, the Court "reiterate[d] . . . that the holding in *Gallagher* was based upon the unique facts before us in that case, and that the decision there should be construed narrowly." *Id.* (citing *Gallagher*, 201 A.3d at 139 n.8).[32]

Following this discussion of *Gallagher*'s holding and scope, the Court addressed whether *Gallagher* affected its decision in *Eichelman*:

> [W]e continue to reject the view that household vehicle exclusions are *ipso facto* unenforceable. *Gallagher* did not undermine *Eichelman*'s central holding in that regard; it simply held that a household vehicle exclusion cannot conflict with Section 1738 by purporting to take away coverage that the law says is mandatory unless waived using a specific form. In cases where the exclusion does not interfere with the insured's ability to stack UM/UIM coverage, *Gallagher*'s *de facto* waiver rationale is not applicable.

*Id.* at *6 (internal footnotes omitted).

### 3. Resolution of the Dispute in This Case: Does Mid-Century Have a Duty to Provide UIM Coverage Under the Subject Policy?

Given the language of the MVFRL along with the development of the law in federal and state courts in Pennsylvania when interpreting the MVFRL, the resolution of the parties' dispute here is much more difficult than it should be. For instance, although the Werleys paid for UM/UIM coverage in both policies, they also waived stacked coverage (and, most importantly, waived stacked coverage in the Subject Policy) and, consequently, paid a lower premium. It is quite possible, and perhaps probable, that the Werleys had no idea that the UM/UIM limits under their

---

[32] Prior to the Supreme Court "reinterpret[ing]" the narrowness of *Gallagher* in *Mione*, Pennsylvania federal and state courts reached conflicting decisions on the scope of *Gallagher*. *See Gramaglia-Parent v. Travelers Home and Marine Ins. Co.*, Civ. A. No. 20-3480, 2022 WL 19264, at *5 (E.D. Pa. Jan. 3, 2022) (citing cases illustrating that, after *Gallagher*, "federal and state courts have been divided over the scope of *Gallagher*'s holding, specifically whether it voids all household vehicle exclusions, regardless of the policy").

two policies could stack together through inter-policy stacking. Yet, for insureds like the Werleys who purchase UM/UIM coverage for a multiple-vehicle policy, the MVFRL, as currently constructed, does not provide them with a method to expressly waive inter-policy stacking. This is because the language of the form stacking waivers in section 1738(d) of the MVFRL, which the General Assembly mandates insurers use when providing insureds with the option to waive stacked coverage, does not address inter-policy stacking. *See Craley*, 895 A.2d at 541 (explaining that "the language of subsection (d) . . . does not clearly address an inter-policy stacking waiver, which would involve the limits for each motor vehicle insured under the *policies*" (citing 75 Pa. C.S. § 1738(d))). Not only did the highest court in Pennsylvania identify this precise issue for the General Assembly almost 17 years ago, but Chief Justice Cappy even provided a potential solution to the issue by suggesting the language for revised UM and UIM stacking waivers. *See id.* at 543 (Cappy, C.J., concurring).

With no action from the General Assembly to rectify the obvious inconsistency between the MVFRL permitting intra- and inter-policy stacking and permitting insureds the option to waive stacking for lower premiums <u>with</u> required form waivers which do not apply to inter-policy stacking, *see id.*, the Pennsylvania Supreme Court in *Donovan* acknowledged that it was constrained to conclude that an insured electing UM/UIM coverage could not waive inter-policy stacking even if the insured (1) "did not sign a waiver, as in *Gallagher*," or (2) "signed a deficient waiver as to inter-policy stacking." 256 A.3d at 1157, 1160. Moreover, the Court recognized that "insurers are placed in a Catch-22 as they are required to provide insureds the opportunity to waive UM/UIM stacking but without the ability to enforce the insureds' waiver of inter-policy stacked coverage in multi-vehicle policies because the statute mandates the use of the Section 1738(d) form." *Id.* at 1157; *see also* 75 Pa. C.S. § 1738(e) ("The forms described in subsection (d) must be

signed by the first named insured and dated to be valid. ***Any rejection form that does not comply with this section is void***." (emphasis added).[33] The Court also pointed out, yet again, that "[t]he remedy [for insurers being placed in a Catch-22] . . . is not with the courts but with the General Assembly, which has the power to amend its language to provide for waiver of inter-policy stacking on multi-vehicle polices." *Id.* As such, the Court "again call[ed] on the Legislature to clarify the Section 1738(d) waiver language and its application to inter-policy UM/UIM stacking." *Id.* To date, nothing has changed in that language.

Thus, at this point in the extensive litigation and numerous decisions on stacking, waiving stacking, and household vehicle exclusions, courts are forced to decide cases in ways that do not correspond with the coverage an insured expressly paid for. *See Gallagher*, 201 A.3d at 138 ("One of the insurance industries' age-old rubrics in this area of the law is that an insured should receive the coverage for which he has paid."). Yet, these decisions also provide a rigid framework for the court to resolve the issues in this case. More specifically, if the court finds that, contrary to Mid-Century's arguments, this is a stacking case, the Werleys would be entitled to inter-policy stacking on the Subject Policy because (1) the court looks to the choices of coverage in that policy instead of the Other Policy, and (2) it is a multi-vehicle policy (a) in which they purchased UM/UIM coverage and (b) any section 1738(d)-mandated waiver they did or did not sign would not have informed them that they were waiving inter-policy stacking. *See id.*[34] Furthermore, if the Werleys

---

[33] In *Erie Insurance Exchange v. Petrie*, the Superior Court indicated that the insurer "should have been aware of the potential defect in the waiver provision in the context of multi-vehicle policies and, it was free to supplement it or otherwise fulfill its obligation to secure a knowing waiver of inter-policy stacking." 242 A.3d 915, 921 (Pa. Super. 2020). Although this makes common sense, it is unclear whether an edited waiver is void, *see* 75 Pa. C.S. § 1738(e), or post-*Donovan*, whether it would be effective to waive inter-policy stacking in any event.

[34] At least one other decision in this court has remarked that "it is the coverage elections for the policy under which coverage is being sought that are controlling, not the coverage elections of the person seeking coverage." *Stockdale v. Allstate Fire and Cas. Ins. Co.*, 441 F. Supp. 3d 99, 105 (E.D. Pa. 2020) (Beetlestone, J.) (citing *Crawley*, 895 A.2d at 536); *see also Crawley*, 895 A.2d at 534 (indicating that exclusions and policy upon which insureds were seeking UIM coverage were "relevant to the legal issues presented in this case").

can stack the policies, Mid-Century's household vehicle exclusion in the Subject Policy, which no one has argued is ambiguous or does not apply to Levi's accident based on the plain language of the exclusion, would act as a *de facto* waiver of stacking, and be voided under *Gallagher* and *Donovan*. Accordingly, the only true dispute in this case revolves around whether it is a case involving stacking. If it is not, then *Eichelman* and *Mione* would apply, and summary judgment would be entered on behalf of Mid-Century. If it is, the court would enter summary judgment in favor of the Werleys for the reasons just stated.

While the court commends the parties on their submissions and arguments in this matter, the essence of those submissions and arguments, at least as they relate to stacking, can be broken down to a single question: For an insured such as Levi to benefit from inter-policy stacking, must there be a "host-vehicle" with UM/UIM coverage upon which to stack? In other words, since the Dirt Bike was uninsured, is there any policy upon which Levi could stack UM/UIM limits? Admittedly, Mid-Century has ample caselaw in support of its argument that without UM/UIM coverage on a host vehicle, there is no UM/UIM coverage upon which to stack other UM/UIM limits. Nevertheless, under the facts of this unique case, for which neither party nor the court could find a case directly on point, the court finds that Levi is entitled to stacked coverage on the Subject Policy despite the Dirt Bike being uninsured.

As the court just stated, Mid-Century's assertion that a host-vehicle policy is necessary for inter-policy stacking to occur is a reasonable interpretation of the applicable caselaw. In this regard, Mid-Century first points to *Eichelman*, Pl.'s Br. at 9–14, where the Pennsylvania Supreme Court concluded that if "a person . . . has voluntarily elected not to carry [UIM] coverage on his own vehicle," that person cannot recover UIM benefits from a separate policy issued to a family member with whom the person resides, if that policy has an unambiguous household vehicle

exclusion. 711 A.2d at 1010. This language surely places the focus on the UM/UIM coverage issue on the vehicle the injured party was operating or occupying at the time of the accident.

After *Eichelman*, many, if not all cases dealing with inter-policy stacking issues appeared to turn on whether there was UM/UIM coverage on the insured's vehicle involved in the accident. For instance, in *Dunleavy v. Mid-Century Insurance Co.*, which was decided after *Gallagher*, the United States District Court for the Western District of Pennsylvania addressed a dispute where a motorcyclist and his wife (who was a passenger on the motorcycle) sought stacked UIM benefits through a multi-vehicle policy in which they were named insureds even though the motorcyclist had rejected UIM coverage on a policy covering the motorcycle. 460 F. Supp. 3d 602, 606 (W.D. Pa. 2020), *aff'd*, 848 F. App'x 528 (3d Cir. 2021). The multi-vehicle policy contained a household vehicle exclusion that would have excluded the motorcyclist's accident based on the plain language of the exclusion. *See id.* at 606 (stating exclusion); *id.* at 607 ("Mid-Century did not cover the motorcycle Plaintiffs were riding at the time of the accident. Thus, if the household vehicle exclusion is enforceable, Mid-Century was right to deny coverage."). The motorcyclist and his wife argued that this exclusion was unenforceable under *Gallagher* because it operated as a *de facto* waiver of inter-policy stacking. *See id.* at 607.

The Western District determined that *Gallagher* was inapplicable to the case because, as Mid-Century argued, the instant case did not involve stacking at all. *See id.* at 607, 608. The court acknowledged that stacked UIM coverage was the default coverage under the MVFRL but explained that "for this default coverage to exist, each of the policies being stacked must 'provide' [UM or UIM] coverage." *Id.* at 608 (citing 75 Pa. C.S. § 1738(a)). Thus, "[f]or *Gallagher* to apply, . . . there must be [UIM] coverage in the first place." *Id.* The court explained:

> When a policyholder buys underinsured motorist coverage for several vehicles, within or across policies, the law authorizes the policyholder to stack the per-

vehicle limits of all that coverage that the policyholder bought. *Gallagher*, 201 A.3d at 137. An insurer cannot insert an exclusion in the policy that effectively prevents the stacking of limits of covered vehicles by saying there is no coverage for some of those vehicles. *Id.* at 138. But this rationale is predicated on the policyholder buying underinsured motorist coverage on *every vehicle* to stack the benefits. That's the fundamental idea behind stacking—the policyholder stacks limits of coverage that he or she paid for. *Id.* ("Gallagher decided to purchase stacked UM/UIM coverage under both of his policies, and he paid GEICO premiums commensurate with that decision."). If the vehicle involved in the accident doesn't have underinsured motorist coverage, then the policyholder can't stack anything on top of it because the policyholder hasn't paid for that privilege.

*Id.*

After *Dunleavy*, the Pennsylvania Superior Court reinforced the necessity for UM/UIM coverage on the vehicle involved in the accident in four cases involving Erie Insurance Exchange. *See Erie Ins. Exch. v. King*, 246 A.3d 332, 341 (Pa. Super. 2021) ("[B]ecause Appellants were not 'insureds' under the [policy covering the vehicle they were in at the time of an accident with an uninsured driver], there is no UM coverage on which to 'stack' [the single-vehicle policy under which they were insured]."); *Erie Ins. Exch. v. Mione*, 253 A.2d 754, 768 (Pa. Super. 2021) ("We agree with Erie and the trial court that stacking and Section 1738 are not implicated in this case. In *Eichelman*, *King*, and *Dunleavy*, stacking was either not discussed or determined to be irrelevant because those individuals who did not have UM/UIM coverage under their host-vehicle policies did not have the requisite UM/UIM coverage on which to stack other household policies with UM/UIM benefits. Similarly, here, Albert's Progressive Motorcycle Policy does not have UIM coverage on which to stack the Erie Auto Policies' UIM benefits. Instead, like the people in *Eichelman* and *Dunleavy*, Albert is using the Erie Auto Policies to procure UIM coverage in the first place. Therefore, this is not a stacking case, and the rationale of *Gallagher* does not apply."), *aff'd*, 2023 WL 2008314 (Pa. Feb. 15, 2023); *Erie Ins. Exch. v. Sutherland*, No. 1113 WDA 2020, 2021 WL 2827321, at *10 (Pa. Super. July 7, 2021) ("Here, like the insured in *Eichelman*, [the

44

appellee] **did not** purchase UIM coverage [for the policy] on his motorcycle. Accordingly, he was not entitled to stacked UIM coverage under his [and the other appellee's policy] for the automobiles, as there was no . . . UIM coverage [on the motorcycle] to stack onto." (citation omitted)); *Erie Ins. Exch. v. Colebank*, No. 1244 WDA 2021, 2022 WL 1162772, at *10 (Pa. Super. Apr. 20, 2022) (concluding that since insured "did not purchase UIM coverage for his own policy[, which covered his Jeep involved in an accident with an underinsured motorist,] he did not have the requisite UIM coverage on which to stack his parents' household policies with UIM benefit [sic]. . . . This outcome is consistent with the MVFRL as [the insured] voluntarily chose not to purchase UIM coverage in his automobile policy, and in return received reduced insurance premiums."). Additionally, the Pennsylvania Supreme Court appeared to do the same in *Mione*:

> [W]hen an insured seeks UM/UIM benefits under a household policy ***but does not have UM/UIM coverage on the vehicle that he or she was occupying at the time of the collision***, it cannot be said that a household vehicle exclusion in the UM/UIM-containing policy is operating as the sort of disguised waiver of stacking that was disapproved in Gallagher. Rather, in such circumstances, the household vehicle exclusion serves as an unambiguous preclusion of all UM/UIM coverage (even unstacked coverage) for damages sustained while operating an unlisted household vehicle.

2023 WL 2008314, at *5 (emphasis added).

Despite this seemingly abundant support for Mid-Century's position in this case, none of the aforementioned cases involved the unique facts of this case. In the first instance, while Mid-Century points out that the Dirt Bike was not covered under the Werleys' policies, the Werleys were not required to inform Mid-Century about the Dirt Bike or obtain insurance for the Dirt Bike. In most of the cases that the parties referenced or this court could locate, the ultimate determination that the case did not involve stacking involved the party seeking coverage declining to purchase UM/UIM coverage for the policy covering the vehicle the party was occupying or operating at the

time of the accident.[35] Thus, those individuals seeking UM/UIM coverage from another policy had insured the vehicle they were occupying or operating at the time of the accident, but also voluntarily opted to not pay for UM/UIM coverage. Here, the Werleys did not insure the Dirt Bike and then opt to not pay for UM/UIM coverage.[36] As far as they were concerned, they were not required to insure the Dirt Bike at all because it was not being operated on public roads, and Mid-Century has not argued that they were required to insure it. Seemingly every case that either expressly or impliedly focused on a host vehicle did so because there was no indication that the vehicle the claimant was occupying or operating at the time of the accident was not **required** to be insured. And those vehicles were insured; they were just not covered for UM/UIM benefits because the individuals purchasing those policies voluntarily opted to forgo UM/UIM coverage (presumably in return for lower premiums). Since the vehicles involved in the accidents with the uninsured or underinsured motorists were insured, the MVFRL dictates what happens when a party seeks UM/UIM benefits and "multiple policies apply": First, the party must look to "a policy covering the motor vehicle occupied by the injured person at the time of the accident," 75 Pa. C.S. § 1733(a); Then, the party must look to "a policy covering a motor vehicle not involved in the accident with respect to which the injured person is an insured." *Id.* § 1733(b). Due to this priority structure, it follows that courts would look to whether the "host vehicle" had UM/UIM coverage when determining if there was the possibility for inter-policy stacking because the individual

---

[35] An example of the cases that did not involve a claimant who did not voluntarily decline UM/UIM benefits and yet sought them in a separate auto policy under which the claimant was insured was *King*, where the claimants were ineligible for UM coverage under the policy covering the truck they were in at the time of the accident because they were not insureds under that policy. 246 A.3d at 339.

[36] While Mid-Century accurately points out that UM/UIM coverage is optional, *see* Pl.'s Br. at 7, 16, an individual insuring a vehicle as required by the MVFRL must expressly waive UM/UIM coverage in waivers that must "specifically comply" with the form language in subsections 1731(b.1) and (c.1). *See* 75 Pa. C.S. § 1731(c.1); *see also id.* § 1731(b.2) (indicating that "[t]he rejection language of subsection (b.1) may only be changed grammatically to reflect a difference in tense in the rental agreement or lease agreement"). Not seeking to insure a Dirt Bike that did not require insurance based on its use, is not like someone obtaining insurance and then executing the necessary waivers to opt-out of UM/UIM coverage.

seeking coverage always had to look to the policy covering the vehicle first. It is also understandable to decline an injured person's attempt to obtain UM/UIM coverage under separate policies when they specifically waived that coverage when insuring the vehicle they were operating or occupying at the time of the accident. At bottom, those courts logically determined that unless the host vehicle's policy provided UM/UIM coverage, inter-policy stacking was not implicated.

In this case, Mid-Century attempts to place the Werleys' lack of insurance on the Dirt Bike in the same class as the UM/UIM cases discussed above, which involved claimants who were presented with the option and then chose to forgo UM/UIM coverage on the vehicle involved in the accident. Moreover, Mid-Century is attempting to do this in circumstances where, at least for purposes of these cross-motions for summary judgment, the Werleys neither knew that they could insure the Dirt Bike nor believed that they needed to insure it because it was being operated only off-road. This court is unwilling to take the step of placing the Werleys in the same place as individuals who purchased insurance, then expressly waived UM/UIM coverage through statutorily mandated waivers, and then sought UM/UIM stacked benefits on other auto policies in which they were insured. Overall, this case does not involve facts where the individuals seeking coverage "***voluntarily elected*** not to carry [UIM] coverage on [their] own vehicle," *Eichelman*, 711 A.2d at 1010. Accordingly, this is not a case where stacking is not implicated because the vehicle the injured person was operating or occupying at the time of the accident was not covered for UM/UIM benefits.

This conclusion leads the court to, perhaps, the most unique aspect of this case: Mid-Century has already paid UIM benefits to the Werleys under the Other Policy, which would qualify as a second-priority policy under section 1733(a). As such, the Werleys' ability to stack coverage

on the Subject Policy is not dependent on the UM/UIM coverage (or lack of UM/UIM coverage) on the Dirt Bike, but on Levi being covered for UIM benefits under the Other Policy. Due to this distinction, the Werleys are not attempting to stack on a policy covering the Dirt Bike (which they obviously could not do as it was uninsured); instead, they are seeking to stack on a policy which already provided UM/UIM benefits to Levi. For the stacking provisions in section 1738 to be implicated, "the insured must have received UM/UIM coverage under *some other policy first*." *Mione*, 2023 WL 2008314, at *5. In the cases cited by Mid-Century, as well as other cases reviewed by this court, the insureds did not first receive UM/UIM coverage under another policy, which appeared to always be the host vehicle policy, before seeking to inter-policy stack other auto policies in which they were insured for UM/UIM benefits. *See, e.g.*, *Mione*, 289 A.3d at 525–26 (explaining that policy covering motorcycle, which claimant was operating at time of accident with underinsured motorist, did not include UM/UIM coverage, and insured then sought stacked UIM benefits under two policies covering other vehicles in which individual was an insured for UIM benefits). Here, Mid-Century has paid UIM benefits to the Werleys under the Other Policy, so there is coverage upon which to stack UIM coverage from the Subject Policy.

To state it somewhat differently, all the cases where courts followed *Eichelman*, involved, at their core, similar facts: (1) claimants were operating or occupying a vehicle which was covered by insurance in which (a) the purchaser of the policy waived UM/UIM coverage or (b) they were not insureds under the policy to the extent it had UM/UIM coverage, *see, e.g.*, *King*, 246 A.3d at 341 (explaining that UM benefits claimants were guest passengers in host vehicle and were therefore not insureds under policy covering host vehicle that had UM coverage); (2) claimants could not recover UM/UIM benefits under the host vehicle policy; (3) claimants were insured under at least one other policy insuring vehicles not involved in the accident and the policy

included UM/UIM coverage; and (4) these second-priority policies covering vehicles not involved in the accident had exclusions (typically family car or household vehicle exclusions) that excluded UM/UIM coverage for the claimants based on the accident falling within the plain terms of the unambiguous language in the exclusions. *See, e.g.*, *Dunleavy*, 460 F. Supp. 3d at 606; *Colebank*, 2022 WL 1162772, at \*10. At bottom, the claimants were seeking UM/UIM "coverage *in the first instance*" on a second-priority policy. *Mione*, 289 A.3d at 530. The courts concluded that the claimants could not receive such coverage in the first instance because the policies under which they were seeking to obtain coverage contained exclusions which excluded coverage.[37] *See id.* Presumably, the claimants were proceeding in this manner, particularly after *Gallagher*, because (1) household vehicle exclusions were extremely difficult to overcome due to the *Paylor*, *Windrim*, and *Eichelman* line of cases refuting public policy challenges to them and (b) the way to bypass those exclusions after *Gallagher* was to show that they acted as a *de facto* waiver of inter-policy stacking. The courts repeatedly rejected these challenges because there truly was no policy with UM/UIM coverage upon which to stack: the host vehicle policy lacked such coverage and the second-priority policies covering other vehicles in which the claimants were insureds had applicable and enforceable exclusions.

That simply is not the case here. In this case, even if the Werleys insured the Dirt Bike and voluntarily elected to waive UM/UIM coverage, Levi received UIM benefits under the Other Policy because the household vehicle exclusion in that policy was worded just differently enough from the Subject Policy that Levi's accident was not excluded. Thus, the Werleys are not seeking UIM coverage from the Subject Policy "*in the first instance*." *Id.* Instead, they are trying to stack

---

[37] The court recognizes that the courts deciding these cases were also very concerned about the insureds attempting to obtain coverage that they voluntarily elected not to pay for on the policy covering the vehicle involved in the accident through other policies where they may have paid less in premiums. *See generally Eichelman*, 711 A.2d at 1010.

the UIM coverage limits for Levi under that policy. As Mid-Century determined that there was no exclusion precluding Levi from UIM coverage in the Other Policy and paid Levi UIM benefits under that policy, Mid-Century's payment of UIM benefits to Levi distinguishes this case from all the other cases where claimants attempted to differentiate their facts from *Eichelman* and invoke *Gallagher*'s *de facto* waiver of inter-policy stacking to avoid an exclusion precluding UM/UIM coverage from a policy not covering the vehicle involved in the accident "*in the first instance.*" *Id.*

Additionally, the court's conclusion about the Werleys' ability to stack coverage on the Subject Policy is supported by the language of the MVFRL. When reviewing this language, the court recognizes that the

> goal in interpreting statutory language is to "ascertain and effectuate the intention of the General Assembly." 1 Pa. C.S. § 1921(a). "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." *Id.* § 1921(b). However, when the language is ambiguous, the Statutory Construction Act guides us to consider, inter alia, the "occasion and necessity for the statute" and the "object to be obtained." *Id.* § 1921(c).

*Donovan*, 256 A.3d at 1151.

Under the MVFRL, UIM coverage is intended to "provide protection for persons who suffer injury arising out of the maintenance or use of a motor vehicle." 75 Pa. C.S § 1731(c). This intent is fulfilled in this case as Levi suffered his injuries arising out of the use of the tortfeasor's Jeep, which was underinsured, and Levi was insured for UIM benefits under his parents' policies with Mid-Century. In addition, while section 1733 establishes the priority for recovering UM/UIM benefits when multiple policies apply, there is no provision in this section stating that if a claimant cannot obtain UM/UIM benefits from a first-priority policy, the claimant is ineligible for stacking if the policies covering the claimant are two second-priority policies.[38] *See generally* 75 Pa. C.S.

---

[38] Although it is somewhat unclear, it appears at points in its brief that Mid-Century contends that second-priority policies cannot stack. If that is its contention, it appears to be mistaken because if second-priority policies can never

§ 1733; *see also Meyers v. Travelers Ins. Co.*, 597 F. Supp. 3d 745, 753 (E.D. Pa. 2022) ("Section 1733 does not address the coverage limits available when a victim is insured under multiple policies of equal priority . . . ."). Most importantly, section 1738, the portion of the MVFRL containing the Commonwealth's requirements for stacking and waiving stacking, is silent as to any requirement that an insured must be occupying or operating a motor vehicle with UM/UIM coverage for inter-policy stacking to occur. Instead, it provides that "[t]he limits of coverages under this subchapter for an insured shall be ***the sum of the limits for each motor vehicle as to which the injured person is an insured***." 75 Pa. C.S. § 1738(a); *see* 75 Pa. C.S. § 1702 (defining

---

stack together for greater UM/UIM limits, Levi could never recover inter-policy stacked benefits in other situations where he was injured by an uninsured or underinsured motorist but not occupying or operating a vehicle with UM/UIM coverage. For instance, presuming the Werleys did not waive stacking their policies with Mid-Century, concluding that second priority policies could not stack would deny inter-policy stacking if, *inter alia*, Levi was hit by an underinsured motorist while he was crossing a crosswalk at night; Levi was injured while riding his bike when an uninsured motorist collided with him; or if Levi was riding his skateboard and an uninsured motorist jumped onto a sidewalk and hit him. Per Mid-Century's possible argument, there would never have been inter-policy stacked coverage because Levi was not occupying a vehicle which was covered for UM/UIM benefits at the time he suffered injuries at the hands of an underinsured or uninsured motorist. At bottom, as much as Mid-Century wants to focus on the Dirt Bike not being insured (and the court understands its focus in this regard), it does not follow that the MVFRL precludes inter-policy stacking between second-priority policies when one of them first pays UM/UIM benefits to an insured under another second-priority policy.

In addition, the ability of second-priority policies to inter-policy stack appears to be at least somewhat supported by *Erie Insurance Exchange v. Backmeier*, 287 A.3d 931 (Pa. Super. 2022). In *Backmeier*, a mother whose son was tragically killed by an underinsured motorist while her son was riding his bike, sought UIM coverage through two insurance policies she had through Erie Insurance Exchange ("Erie"), which each provided for $100,000/$300,000. 287 A.3d at 934. The mother had executed stacking waivers on both policies, and the policies also "contained a 'Limit of Protection' provision which capped total recovery under all household policies at the highest limit available under any single policy." *Id.* Pursuant to the "Limit of Protection" provision, Erie tendered $50,000 under each policy (for a total of $100,000) to the mother. *Id.*

Erie then filed a complaint seeking a declaratory judgment that it did not owe more than the $100,000 to the mother under the policies. *See id.* The trial court ultimately decided in favor of Erie, and the mother appealed to the Superior Court. *See id.* at 935. On appeal, the mother raised two issues, including a claim that she should be entitled to stack the UIM coverage limits under both policies because the stacking waivers she executed did not preclude inter-policy stacking. *See id.* After reviewing the mother's policies, the Superior Court determined that each policy only insured one vehicle; as such, the section 1738(d) waivers that would not have otherwise waived inter-policy stacking, were valid waivers under *Craley* because each policy only covered a single vehicle. *See id.* at 942. Accordingly, the mother was not entitled to inter-party stacking.

Recognizing that the issue very well was not raised in the case (even before the trial court), if stacking was dependent on a host vehicle with UM/UIM coverage (a/k/a a policy falling under section 1733(a)(1)), this is precisely the type of case that would not withstand even minimal scrutiny in court. The boy was on his bicycle when he died, and his mother sought UIM benefits under her policies covering vehicles that were not involved in the boy's death. There was no mention of the mother not being able to inter-policy stack UIM coverage limits for any other reason than the stacking waivers she executed.

"insured"). Essentially, section 1738(a) states that if an insured receives UM/UIM benefits under a policy and is an insured under a second policy, section 1738(a) provides that the UM/UIM limits of those coverages stack. In this rare situation, the UM/UIM benefits follow the insured and not the vehicle.[39] *See Burstein*, 809 A.2d at 209 (discussing different priority schemes in 75 Pa. C.S. § 1702 for first party coverage and 75 Pa. C.S. § 1733 for UM/UIM coverage, and remarking that "[t]hese divergent priority schemes demonstrate that, under the MVFRL, UM and UIM benefits do not necessarily 'follow the person' in the same manner as first party benefits).

Having concluded that the Werleys' UIM limits in this case can stack on the Subject Policy, the remainder of the court's analysis is well-established. Insureds with multiple policies providing UIM coverage stack by default. *See* 75 Pa. C.S. §§ 1731, 1738. The MVFRL creates only one way to opt out of default stacked UM/UIM coverage: executing a statutorily prescribed waiver. *See id.* § 1738(d); *see also Gallagher,* 201 A.3d at 137 (holding that MVFRL requires execution of statutorily prescribed waiver to reject stacked UIM coverage). Although the Werleys executed an intra-policy stacking waiver in accordance with section 1738(d), this waiver was insufficient to demonstrate that the Werleys knowingly waived inter-policy stacking because the Subject Policy insures multiple vehicles. *See Donovan*, 256 A.3d at 1157 (explaining that section 1738(d) waiver "does not provide the necessary knowing waiver of inter-policy stacked coverage" in multi-vehicle policy); *cf. Craley*, 895 A.2d at 542 (concluding that execution of section 1738(d) waiver does demonstrate knowing waiver of inter-policy stacking in single-vehicle policy because, *inter alia*, it could not refer to intra-policy stacking because it only applies to multiple vehicle policies). Since

---

[39] Mid-Century asserts that the Werleys "never paid a single dollar in premiums for insurance coverage of the Dirt Bike." Pl.'s Br. at 3. Although this assertion appears to be correct, it ignores that the Werleys did elect UM/UIM coverage on their policies and paid premiums for those elections. *See generally N. River Ins. Co. v. Tabor*, 934 F.2d 461 (3d Cir. 1991) (explaining that "the reasonable expectations of the insured[] . . . reflects the concept that the insured, having paid multiple premiums, is entitled reasonably to believe that he has multiple coverage—*e.g.*, having paid for a total of $300,000 worth of uninsured/underinsured motorist coverage ($100,000 on each of three vehicles), the insured is entitled to $300,000 worth of coverage").

the court must conclude that the Werleys did not knowingly waive inter-party stacking on the Subject-Policy, they are entitled to inter-policy stacking, and the unambiguous household vehicle exclusion in the Subject Policy would operate as a *de facto* waiver of stacking. *See Gallagher*, 201 A.2d at 138; *Donovan*, 256 A.3d at 1160. As such, the exclusion is "invalid and unenforceable." *Gallagher*, 201 A.2d at 138.[40]

## V.    CONCLUSION

While Mid-Century understandably focuses its attention on the Werleys because, *inter alia*, they allowed Levi to operate a dirt bike which was uninsured, this case does not get here if there was a statutorily prescribed waiver that covered inter-policy stacking. Although the MVFRL has laudable goals of ensuring that costs of insurance do not spiral out of control and providing protection for innocent victims of accidents caused by uninsured and underinsured motorists, the unremedied inconsistency in the section 1738(d) form waivers of stacking ensures in a case like this that people get more than the benefit for their bargain with the insurance company. This statement is not reflective on the Werleys, who had their son seriously injured through the fault of an underinsured motorist and are trying to help their son receive full compensation for those injuries. Nonetheless, there is no indication that they would have elected inter-policy stacking and only waived intra-policy stacking in their policies, and there is no dispute that although they paid insurance premiums in this case for UM/UIM coverage under both policies, they did not pay for the stacked coverage they are obtaining via this decision.

---

[40] Although Mid-Century asserts certain MVFRL policy-related arguments in support of denying coverage in this case, *see* Pl.'s Br. at 17–18, this court "sitting in diversity . . . must follow Pennsylvania substantive law as interpreted by its Supreme Court." *Donovan*, 2022 WL 473025 at *3 (citing *Crystallex Int'l Corp.*, 879 F.3d at 84). As already stated, multiple aspects of this case are strictly controlled by the applicable precedent. Nevertheless, in light of the unique nature of this case, this court does not find that determining coverage in this unique case is inconsistent with or will cause issues with the cost-containment goals of the MVFRL.

To recap, the Werleys are entitled to stack coverage in this case because they received UIM benefits under the Other Policy, and section 1738(a) does not limit stacking to situations where there is a host policy with UM/UIM coverage. Instead, the Werleys only needed to obtain UIM benefits from another auto policy covering Levi as an insured first before seeking to stack UIM limits on another policy. Since the Werleys received UIM benefits under the Other Policy, it is irrelevant whether the Dirt Bike lacked UIM coverage because the UIM payment from the Other Policy demonstrates that they are not attempting to seek UIM coverage from the Subject Policy "*in the first instance*." *Mione*, 289 A.3d at 530. Therefore, they are entitled to stack the UIM limits from the Other Policy on another policy covering a vehicle in which Levi is an insured, which in this case is the Subject Policy, as long as they have not waived inter-policy stacking in the Subject Policy.

Although the Werleys expressly waived intra-policy stacking when purchasing the multi-vehicle Subject Policy, *Donovan* holds that the section 1738(d) waiver the Werleys executed for intra-policy stacking is insufficient as a matter of law to show that they knowingly waived inter-policy stacking in a multi-vehicle policy with UM/UIM coverage. The Werleys are therefore entitled to inter-policy stacked UIM coverage by default under section 1738(a). In addition, although the Subject Policy has an unambiguous household vehicle exclusion that would exclude coverage for Levi's injuries in this case based on the plain language of the exclusion, this court cannot enforce it because it operates a *de facto* waiver of stacking pursuant to *Gallagher* and *Donovan*. At bottom, Levi is entitled to stack UIM coverage limits from the Subject Policy onto those of the Other Policy. Accordingly, the court will grant the Werleys' motion for summary judgment, deny Mid-Century's motion for summary judgment, enter a judgment in favor of the Werleys and against Mid-Century on the complaint and the Werleys' counterclaim, which includes

a declaration that Mid-Century has a duty to provide UIM coverage under the Subject Policy to Levi for the subject accident.

      As a final note, the court highly encourages the General Assembly to reexamine the MVFRL stacking provisions to provide clear guidance to insurers and insureds about the UM and UIM coverage available to them. The court's encouragement here is not a reflection of any desire to preclude injured parties from being properly compensated for injuries caused by uninsured and underinsured motorists. However, insureds should be fully compensated based on the coverage they elected and corresponding premiums remitted to the insurer. Conversely, requiring the insurer to cover something for which they did not receive higher premiums for, simply because they are faced with a "Catch-22," *Donovan*, 256 A.3d at 1157, regarding stacking waivers, seems inequitable, especially when it can seemingly be easily remedied as the late-Chief Justice Cappy suggested approximately 17 years ago.

      The court will enter a separate order.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.